PUBLISHED

COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, McCullough and Senior Judge Bumgardner


DUNG THI THACH AND
 CARLOS MENDOZA
                                                    OPINION BY
v.       Record No. 1309-13-4                JUDGE ROBERT J. HUMPHREYS
                                                    MARCH 18, 2014
ARLINGTON COUNTY DEPARTMENT
 OF HUMAN SERVICES


FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Louise M. DiMatteo, Judge

(Mark S. Thrash; G. Rex Flynn, Jr.; The Flynn Law Firm, PLLC,
on brief), for appellants.  Appellants submitting on brief.

(Jason L. McCandless, Assistant County Attorney; Phong T.
Nguyen, Guardian *ad litem* for the infant child; Office of the County
Attorney, on brief), for appellee.  Appellee and Guardian *ad litem*
submitting on brief.


       Dung Thi Thach ("Thach" or "mother") and Carlos Mendoza ("Mendoza" or "father")

jointly appeal the Arlington County Circuit Court's (the "circuit court") decision to grant the

Arlington County Department of Human Services's ("DHS") petitions to terminate their residual

parental rights with regard to their son ("J.M.").  Appellants' single assignment of error is "that

the evidence was insufficient to show by clear and convincing evidence that the Petitioner,

Carlos Mendoza, failed to substantially remedy the conditions that brought his son, J.M., into

[foster] care within the provisions of [] Code § 16.1-283."

       As a preliminary matter, we note that although both Thach and Mendoza jointly appealed

the circuit court's decision to terminate their parental rights, appellants only assign error to the

circuit court's termination of Mendoza's parental rights.  Consequently, notwithstanding the

style of the case and the fact that Thach argues that the circuit court erred in terminating her

parental rights, we do not consider her arguments.  Rule 5A:20(c); see Fox v. Fox, 61 Va. App. 185, 202-03, 734 S.E.2d 662, 670 (2012) (an issue is waived when it is not included in appellant's assignment of error).

## I. BACKGROUND

"On appeal from the [denial of a petition for the] termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the [trial] court."  Tackett v. Arlington Cnty. Dep't of Human Servs., 62 Va. App. 296, 303, 746 S.E.2d 509, 513 (2013).  Therefore, viewing the evidence in the light most favorable to DHS, the evidence establishes the following.

### A.  J.M.'s Initial Placement in Foster Care

In August 2010, DHS began to receive complaints that Thach was physically neglecting her son J.M., born December 4, 2009.[1]  After an investigation, DHS reported that J.M. was being physically abused because the family was facing eviction, the utilities had been disconnected, Thach was under the influence of substances while caring for J.M., and was leaving him with inadequate caregivers.  At that time, J.M. was in the sole custody of Thach.  Thach reported that J.M.'s father, Mendoza, did not live with them as he had been deported to Mexico.  Thach refused to give DHS any contact information for Mendoza.  DHS obtained a protective order in March 2011.  DHS provided the family services to prevent J.M.'s removal, including mental health services for Thach, housing and employment services, and daycare services.  Thach failed to comply with DHS's recommendations.

The Arlington County Juvenile and Domestic Relations District Court (the "J&DR court") granted DHS's petition to remove J.M. from Thach's custody on June 29, 2011.  Thach

---

[1] Thach's fifteen-year-old daughter, fathered by someone other than Mendoza, was also living with her at this time.  She currently resides with Thach's sister, her maternal aunt.

had failed to make appropriate child care arrangements for J.M.—she left him with individuals whom she could not provide DHS with basic information for, such as last names or telephone numbers. In August 2011, the goal of DHS's first foster care plan was to return J.M. to Thach's custody. The plan required Thach to complete certain requirements before J.M. could be returned to her care, which included compliance with mental health services, maintain a source of income, refrain from drug use, receive parenting education, and obtain stable housing.

### B. Mendoza's Involvement with DHS While J.M. was in Foster Care

Both parties acknowledge that there have never been any accusations that Mendoza abused or neglected J.M., or was in any way involved with the circumstances requiring J.M.'s removal from Thach's custody. DHS's first contact with Mendoza was on October 6, 2011 when Mendoza accompanied Thach to a scheduled visitation with J.M. At that visitation he told DHS that he had been living and working in Arizona but had returned to Virginia where he was living with his maternal aunt. He said that the reason for the delay in initially seeing his son was that he was afraid of being deported again; however, he now had begun the legal process for obtaining a work permit and legal residency in the United States. At the October 6, 2011 meeting with DHS, Mendoza informed DHS that he was also the biological father of Thach's then unborn child. By the October 25, 2011 status hearing, Mendoza had moved back to Arizona but continued to attend visitations with J.M. in November and December 2011. DHS did not have any direct contact with Mendoza and only communicated with him through messages left with Thach. DHS's February 2012 progress report indicated that DHS had provided no services to Mendoza because of difficulty communicating and meeting with him.

In March 2012, Mendoza moved in with Thach and began caring for their newborn son ("J.T.") while Thach was working. Mendoza reported to DHS that he had hired an immigration attorney and was applying for a work permit, however he was unable to get employment for fear

it would affect his work permit application. J.M. began overnight visits with Mendoza, Thach, and J.T. in May 2012. J.M. refers to Mendoza as "Papi" and gives him "hugs and kisses." J.M. asks to see J.T. and gives his brother hugs and kisses. In the June 2012 progress report DHS reported that Thach and Mendoza "have made tremendous progress." Specifically, "Mendoza continues to be a strong support in the home," and during his interactions with J.M. and J.T. "he is very active, attentive and loving with both boys . . . respond[ing] immediately when either child calls for attention." DHS referred Mendoza to parenting education classes and home-based services.

Three months later, on September 12, 2012, J.M.'s social worker wrote a memo to the J&DR court recommending the discontinuation of the goal of reunification and a change to a goal of adoption. Immediately preceding this change in recommendation, DHS had suspended J.M.'s unsupervised visits due to Thach's missed and failed random drug screenings. Additionally, Thach had been sentenced to four weekends in jail for a traffic offense. Due to Thach's substance abuse issues, a safety plan was created for J.M.'s younger brother J.T. The plan stipulated that Thach was not to be left alone with J.T., and Mendoza was to remain home with the infant. DHS was also concerned that Thach and Mendoza did not renew their housing assistance in July because they wished to pay their rent without assistance. Thach and Mendoza canceled two scheduled visitations with J.M. in late August. As of September 2012, Mendoza had not completed the recommended parenting classes. The parenting class coordinator left messages with Thach but never spoke directly to Mendoza. On September 8, 2012, DHS contacted Thach about scheduling a meeting to discuss alternative plans to J.M. returning home, such as possible placement with a relative, but Thach told them that Mendoza was "away at a beach" and would not be back for a week. No meeting was ever scheduled.

On November 19, 2012, the J&DR court approved the new goal of adoption and scheduled a termination hearing.  However, the J&DR court ordered that the case should be set out "past 90 days to give father more time to comply with the previous plan."  The J&DR court further ordered that DHS "is required to help father with services," (but not mother) and "if father is making progress, [DHS] is to file a new plan before the termination hearing."

In December 2012, Mendoza successfully completed an eight to ten week parenting education program.  Additionally, he submitted to the psychological evaluation ordered by the J&DR court in January 2013, which was filed with that court in March 2013.  The report recommended home support for Mendoza.  DHS was concerned about Mendoza's "lack of insight into Thach's mental health and substance abuse needs."  During the psychological evaluation, Mendoza stated that he did not think Thach had a substance abuse problem and that he felt comfortable with her caring for the children.  On January 22, 2013, J.M.'s social worker filed an affidavit for terminating Mendoza's rights.  The only changes in circumstances since the November hearing noted in the affidavit were that Mendoza had enrolled and completed parenting classes in December 2012 and that Mendoza and Thach's landlord reported that they were behind on their rent and utility bills as of January 16, 2013.

Thach moved out of the family's residence by March 13, 2013.[2]  On March 14, 2013, the J&DR court terminated both Thach's and Mendoza's parental rights pursuant to Code § 16.1-283(C)(2).  At the J&DR court termination hearing, DHS had no major concerns about Mendoza's ability to care for the children on his own; however, DHS's "major concern was related to [Mendoza's] acknowledgement of [] Thach's substance abuse issues, and his lack of

---

[2] Mendoza asserts that Thach moved out in mid-February 2013; however, when a DHS worker conducted an unscheduled visit on March 13, 2013, Thach was present in the home and told the social worker she was moving out that evening.

acknowledgement that she continued to abuse substances, and [sic] around the children." DHS's position was that Mendoza's unawareness demonstrated his inability to protect the children from Thach's substance abuse issues. Mendoza concedes that he still did not fully acknowledge Thach's substance issue at the J&DR hearing. Mendoza and Thach appealed the J&DR court's decision to terminate their parental rights to the circuit court.

During the June 10, 2013 circuit court hearing, Mendoza testified that Thach moved out in March because he wanted to recover his children. Mendoza then acknowledged that Thach had a substance abuse problem. When he was asked why he now felt differently than he had at the time of the March termination hearing he said "she hasn't done her part, and I am just here to get my children, because I love them . . . I don't want to lose them." He stated that he was willing to do whatever was necessary to get his child back. When the Commonwealth asked what role Thach would play in his children's lives if he was granted custody, Mendoza responded: "At the present time, I don't think—none. At this point in time, I just want to make progress with them. I don't think she has any role to play." Mendoza stated that his plan for the future was to continue "working hard, being a dedicated parent to them, feed them, bathe them, and you know, raise them the way they should be raised."

The record is devoid of any indication that Mendoza has in any way abused or neglected either of his sons, or ever used any drugs himself. When DHS visited Mendoza's home after Thach moved out, DHS did not find any indication that it was an inappropriate place for children or anything but a loving and familial environment. DHS did not have any concerns about Mendoza's ability to care for J.M.'s younger brother J.T. on his own. Mendoza testified that he has been living and caring for J.T. alone since March. He has begun scheduled visits with J.M. without Thach. Mendoza testified that he is confident he can administer J.M.'s asthma medications. Although he did not complete the home-based services DHS recommended in

- 6 -

August 2012, DHS acknowledges that at the time of the circuit court hearing Mendoza was participating in "some sort of service."

Mendoza testified, and was cross-examined, extensively about his employment and housing situation. He has been working for the same employer doing drywall installation in Washington D.C. for over six months. He is paid in cash bi-weekly between $1,300 and $1,400. He does not have any credit cards or a bank account. The proof of employment Mendoza provided consisted of personal checks. His rent is $1,200 a month. Although Thach has not lived in the residence since March, her name is the only adult's name on the lease.

After terminating Thach's parental rights, which the circuit court referred to as "the easier of the two cases," the circuit court next turned to the issue of Mendoza's parental rights. The circuit court acknowledged that there is no debate that Mendoza wants to care for his children; however, the judge noted that the issues he has with "his entire case is that he came to the table very, very late." If "the light bulb went off for [] Mendoza about [Thach]'s inability to care for the children, it came on the eve, if not the day, of the last termination of parental rights trial." The circuit court noted that if Mendoza's involvement had been earlier the "county would have addressed things a little differently" because there were "home based services that weren't taken advantage of," which could have helped Mendoza with "hands-on care for [J.M.] and build him up."

The circuit court was very concerned with Mendoza's ability to provide "the stability a three year old requires or the good judgment that a parent must bring to the table." In particular, the circuit court noted that Mendoza did not have a valid lease, and because of his illegal alien status "he probably can't get a lease with his name on it." The circuit court also cited the fact that both Mendoza and Thach ignored the opportunity for rent subsidy and delayed getting home-based services. The circuit court also concluded that Mendoza ignored Thach's substance

abuse issues "for the longest time" and found Mendoza's "credibility severely lacking" because he had a lot of inconsistencies in his testimony about what jobs he had when and who was actually paying him. Further the record contained conflicting evidence about "when he left the country, when he came back, when he was with [] Thach, when he wasn't with [] Thach, when he was with [J.M.], when he was with [J.T.], when he wasn't, when he was in Arizona." Finally, the circuit court found that Mendoza failed to take advantage of opportunities to visit with J.M. and rejected Mendoza's claims that he didn't know about J.M.'s medical appointments.

In sum, the circuit court found that Mendoza was unavailable to provide a stable home for J.M. and could not "wait another six months or 60 days to figure it out." The circuit court further found that J.M. "has a stable home right now" and is "not only being well cared for, he is thriving" in foster care, and the "the evidence would not support that if [the circuit court] returned him to . . . dad's care."

## II. STANDARD OF REVIEW

"'In matters of a child's welfare, [circuit] courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991) (quoting Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)). This Court presumes that the circuit court "'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Id. "On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Tackett, 62 Va. App. at 303, 746 S.E.2d at 513. Where the circuit court's judgment is based on evidence heard ore tenus, its decision to terminate a parent's rights is entitled to great weight and "'will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (quoting Peple v.

- 8 -

Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1998)). Thus, this Court will not reverse the circuit court's judgment terminating Mendoza's parental rights unless the evidence, viewed in the light most favorable to DHS, was insufficient to support it.

III. ANALYSIS

Before residual parental rights can be terminated under Code § 16.1-283(C)(2) "a trial judge must make two separate inquiries." Richmond Dep't of Soc. Servs. v. Crawley, 47 Va. App. 572, 579, 625 S.E.2d 670, 673 (2006). The circuit court must find, "based on clear and convincing evidence," that (i) "[termination] is in the best interests of the child *and*" (ii) DHS met its burden of proving the requirements of subsection (C)(2). Code § 16.1-283(C) (emphasis added); see Crawley, 47 Va. App. at 578-79, 625 S.E.2d at 673. This statutory scheme is "'designed to protect the rights of the parents and their child,'" and "'must be strictly followed before the courts are permitted to sever the natural bond between parent and child.'" Layne v. Layne, 61 Va. App. 32, 36-37, 733 S.E.2d 139, 140 (2012) (quoting Rader v. Montgomery Cnty. Dep't. Soc. Servs., 5 Va. App. 523, 526, 365 S.E.2d 234, 235-36 (1988)).

"The first prong [of Code § 16.1-283(C)(2)] is to determine the child's best interests." Crawley, 47 Va. App. at 578-79, 625 S.E.2d at 673. In determining what is in the best interests of the child, the circuit court must evaluate and consider many factors: the age and physical and mental condition of the child; the age and physical and mental condition of the parent; the relationship existing between the parent and the child; the needs of the child; the role the parent has played, and will play in the future, in the upbringing and care of the child; and any other such factors that are necessary. Barkey v. Commonwealth, 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986).

Code § 16.1-283(C)'s "second prong relates to the . . . remedying of the conditions that led to foster care." Crawley, 47 Va. App. at 579, 625 S.E.2d at 673. *If* the circuit court finds that

termination is in the best interest of the child, the circuit court may only terminate parental rights if it *also* finds clear and convincing evidence that: DHS

> offered "reasonable and appropriate" services to [the parent] to help [them] substantially remedy the conditions which led to or required continuation of [the child's] foster care placement; and . . . despite those services, [the parent] failed "without good cause" to remedy those conditions "within a reasonable amount of time not to exceed twelve months from the date the child was placed in foster care."

Harrison v. Tazewell Cnty. Dep't of Soc. Servs., 42 Va. App. 149, 161, 590 S.E.2d 575, 581 (2004) (quoting Code § 16.1-283(C)(2)).

> Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a public or private social, medical, mental health or other rehabilitative agency shall constitute prima facie evidence of this condition.

Code § 16.1-283(C)(2). In other words, Code § 16.1-283(C)(2)

> termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes . . . requir[ing] the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services.

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005).

Code § 16.1-283(C)(2)'s twelve-month time limit "was designed to prevent an indeterminate state of foster care 'drift' and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement." L.G. v. Amherst Cnty. Dep't of Soc. Servs., 41 Va. App. 51, 56, 581 S.E.2d 886, 889-90 (2003). However, the factfinder may consider evidence before or after the twelve-month time period in order "'to evaluate the *present* best interests of the child.'" Id. (quoting Roanoke City Dep't of

Soc. Servs. v. Heide, 35 Va. App. 328, 337, 544 S.E.2d 890, 894 (2001)). "'The [circuit] court may discount the parent's current 'progress' if the best interests of the child would be served by termination,'" or it "'may determine that a parent's delayed, but nonetheless substantial, progress may overcome the time delay.'" Id. (quoting Heide, 35 Va. App. at 337, 544 S.E.2d at 894).

This case presents an unusual situation because the parent whose rights are at issue not only had nothing to do with the neglect that caused J.M.'s placement in foster care, but also did not even live with J.M. at the time he was removed from his mother's custody. This raises a question not previously considered by this Court: how does a parent similarly situated to Mendoza "remedy the conditions which led to or required continuation of the child's foster care placement" if he was not the cause of those conditions or living in the home when the conditions occurred?

J.M. was initially removed from his mother's custody because she was neglecting him by abusing substances while caring for him and failing to obtain suitable childcare. J.M.'s placement continued because Thach was unable to abstain from using substances and DHS was concerned that Mendoza and Thach could not provide a stable living situation. During the course of J.M.'s placement in foster care, DHS's primary focus was on providing Thach with services in order for J.M. to be returned to her custody. DHS's only recommendations for Mendoza were to complete parenting classes and participate in home-based services. DHS was also concerned that Mendoza, because of his lack of awareness with respect to Thach's limitations, was unable to protect J.M. from neglect.

Although it is accurate that Mendoza did not make substantial progress in complying with DHS's recommendations during the twelve-month statutory period, by the time of the circuit court hearing in June 2012 the record is also undisputed that he had made significant progress. Moreover, DHS did not begin offering Mendoza services until May 2012—eleven

- 11 -

months after J.M. was placed in foster care and one month shy of the expiration of the statutory period to demonstrate substantial progress. This seems to be the basis for the J&DR court's decision in November 2012 to push back the termination hearing deadline to allow Mendoza more time to comply with the previous plan and ordered DHS to file a new plan "if father is making progress." By the June 2012 circuit court hearing Mendoza had completed parenting classes, underwent the recommended psychological evaluation, and had begun some home-based services. Yet the record reflects that no new plan was prepared. Thach had moved out, and Mendoza was the sole provider for their infant son J.T. DHS reported that its unannounced visits to Mendoza's home after Thach moved out revealed that J.T. was being sufficiently cared for, and DHS expressed no concerns about Mendoza's ability to care for J.T. on his own or that it was an inappropriate place for children.

The Supreme Court has repeatedly emphasized that "'[w]hile it may be occasionally necessary to sever the legal relationship between parent and child, those circumstances are rare.'" Tackett, 62 Va. App. at 320, 746 S.E.2d at 521 (quoting Lowe v. Dep't of Pub. Welfare, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986)). "'Statutes terminating the legal relationship between parent and child should be interpreted consistently with the governmental objective of preserving, when possible, the parent-child relationship.'" Id. While circuit court judges are vested with considerable deference in determining a child's best interest, "[i]t is clear that the Constitution requires more than a mere showing of the child's best interest to terminate parental rights." Copeland v. Todd, 282 Va. 183, 199, 715 S.E.2d 11, 20 (2011). "'The fundamental liberty interest of natural parents in the care, custody and management of their children does not evaporate simply because they have not been model parents or have lost temporary custody . . . to the State.'" Crawley, 47 Va. App. at 581, 625 S.E.2d at 674 (quoting Santosky v. Kramer, 455 U.S. 745, 753 (1982)). "If there is 'reason to believe that positive, nurturing parent-child

relationships exist, the [state's] *parens patriae* interest favors preservation, not severance, of natural familial bonds.'" Id. (quoting Santosky, 455 U.S. at 766-67). Thus, the circuit court could not terminate Mendoza's rights because it felt that J.M's foster parents could provide more stability than Mendoza. See Copeland, 282 Va. at 199, 715 S.E.2d at 19-20 (the state cannot "'infringe on the fundamental right of parents . . . simply because a state judge believes a better decision could be made'" (quoting Troxel v. Granville, 530 U.S. 57, 72-73 (2000))). While the circuit court appropriately expressed concern about Mendoza's stability in the future and his delayed involvement with DHS, standing alone, those concerns are insufficient to establish by clear and convincing evidence that Mendoza's parental rights should be terminated. In order to retain his parental rights, Mendoza was not required to overcompensate for Thach's parental deficiencies—instead the decision whether to terminate his parental rights should have been an independent evaluation. At the time of the circuit court's judgment, the record is clear that Mendoza had completed, or was participating in, the services recommended by DHS, he was providing a satisfactory home for J.M.'s younger brother, and the neglectful parent had been removed from the equation. The circuit court clearly relied heavily on Mendoza's immigration status and insufficient employment verification as evidence that Mendoza may not be able to provide for J.M. in the future. However, the circuit court's speculation was premature. While it is certainly possible that a different situation may obtain in the future that might require revisiting this issue, as of the date of the hearing in this case, there is no evidence in the record that Mendoza was not then adequately providing for J.T. and could not continue to do so. Moreover, at the time of the circuit court hearing Mendoza was in the process of applying for residency and had a court date to resolve his immigration issue set for October 2013.

The termination of parental rights pursuant to Code § 16.1-283(C)(2) amounts to a last resort to protect children when all other reasonable remedies have been attempted and failed and

- 13 -

requires that DHS establish by clear and convincing evidence that termination of a parent's rights is the only reasonable and appropriate recourse—it does not require a parent to prove by clear and convincing evidence that he should retain his fundamental liberty interest in the custody of his child. In sum, we hold that there is insufficient evidence in the record before us to support the circuit court's decision to irreversibly sever Mendoza's parental rights pursuant to Code § 16.1-283(C)(2).

## IV. CONCLUSION

Accordingly, although we affirm the decision of the circuit court in terminating Thach's parental rights, we reverse the circuit court's decision to terminate Mendoza's parental rights with regard to his son J.M. pursuant to Code § 16.1-283(C)(2).

<u>Affirmed in part,<br>and reversed and final judgment in part.</u>