COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Chafin and Malveaux
Argued at Norfolk, Virginia

UNPUBLISHED

CRYSTAL HOUSTON

MEMORANDUM OPINION[*] BY
v.      Record No. 1456-16-1      JUDGE RANDOLPH A. BEALES
JULY 11, 2017

CITY OF NEWPORT NEWS
 DEPARTMENT OF HUMAN SERVICES

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Timothy S. Fisher, Judge

Charles E. Haden for appellant.

Patrick C. Murphrey, Assistant City Attorney; Warren F. Keeling,
Guardian *ad litem* for the minor children, for appellee.


In this appeal, Crystal Houston ("mother") presents three assignments of error. First, she

asserts the circuit court erred in denying her motion to dismiss certain pleadings signed by

non-attorney employees of the Newport News Department of Human Services ("DHS") as

defective and void. Second, mother argues that the circuit court erred in denying her motion to

quash a subpoena *duces tecum* of her mental health records. Finally, mother argues that the circuit

court erred in terminating her residual parental rights with regard to her children pursuant to Code

§ 16.1-283. For the following reasons, we affirm the circuit court.

I. BACKGROUND

"When reviewing a [circuit] court's decision on appeal, we view the evidence in the light

most favorable to the prevailing party, granting it the benefit of any reasonable inferences."

Boatright v. Wise Cty. Dep't of Soc. Servs., 64 Va. App. 71, 76, 764 S.E.2d 724, 727 (2014)

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

(quoting Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 835 (2003)).  So viewed, the evidence established mother and Martin Houston, Sr. ("father")[1] have four biological children together:  M.H.1 (born December 2, 2003), M.H.2 (born October 4, 2004), M.H.3 (born December 15, 2006) and M.H.4 (born July 7, 2009).  On October 24, 2013, DHS received a report that father had injured M.H.3 (a six-year-old at the time) by striking him in the face.  DHS investigated the report and discovered visible injuries on the right side of M.H.3's face.[2]  M.H.1 and M.H.2 told DHS social workers that father had struck M.H.3 across the face.  As a result of this investigation, all four children were placed in foster care.

While the children were in foster care, they told social workers about other instances of physical abuse by mother and father.[3]  M.H.1 told social workers that "her parents would hit them, smack them in the face, kick them, throw things at them, put hot sauce and sap in their mouths, . . . grab them by the neck, . . . pull them by their ears and hit them with belts and shoes."  She also said that her mother threw a glass bottle at M.H.3's head on one occasion. M.H.1 told social workers that "she was afraid that if she went back home to her parents, they would kill her and her siblings."

Despite the allegations of physical abuse from the children, mother and father repeatedly denied any form of wrongdoing when confronted by DHS.  Father denied that he ever hit or physically abused the children, and he explained that M.H.3 sustained the facial injuries observed by the DHS social workers when he fell on bleachers at a football game.  Mother also

---

[1] The circuit court also terminated the residual parental rights of father.  Father appealed the circuit court's decision on the same grounds argued by mother in this case.  See Houston v. City of Newport News Dep't of Human Servs., No. 1532-16-1 (Va. Ct. App. July 11, 2017) (this day decided).

[2] The record of this case does not establish the extent of M.H.3's injuries.  It does, however, establish that the injuries caused M.H.3 to miss at least two days of school.  Comments made by mother and the social workers suggest that M.H.3 may have sustained a concussion.

[3] Mother and father were married at all times relevant to this appeal.

claimed that M.H.3's injuries were the result of an accidental fall. Mother admitted that she "popped" her children on the mouth on a daily basis.

DHS devised and submitted multiple foster care review plans to remedy the conditions that led to the placement of the children in foster care. While the initial goal of these plans was to return the children to mother and father, subsequent plans were modified to include the concurrent goal of relative placement. The foster care plans required mother to "provide an environment for [her] children that [was] safe and free from abuse [and] neglect," "reduce risk factors for abusing children," maintain a "lifestyle free of corporal punishment," and take parenting and anger management classes. The foster care plans also required mother to participate in structural family therapy and individual therapy. Mother was also required to sign consent forms to allow DHS to monitor and track mother's participation in therapy and her therapeutic progress. The foster care plans required mother to remain in contact with her children and DHS.

The initial foster care plans also required mother to participate in a psychological and parenting capacity evaluation and comply with its recommendations. Jennifer Gildea, a licensed clinical psychologist, conducted the psychological and parenting capacity evaluation of mother on March 10, 2014. In her evaluation, Gildea noted that mother believed that DHS had "conspired against her family in order to keep the children in foster care." Mother also told Gildea that she did not believe that father had struck M.H.3.

Ultimately Gildea concluded that:

> Ms. Houston seems to underestimate the degree of force, anger, or aggression that is present in her parenting and disciplinary style. It will be important for her to gain improved insight into such dynamics in order to reduce her risk of either inflicting abuse herself or of supporting disciplinary methods that may result in injury to the children, even if unintended. She must further examine tendencies to be overly protective of Mr. Houston at the

expense of fully cooperating with CPS and law enforcement personnel.

Accordingly, Gildea recommended ongoing individual and structural family therapy services to help mother reduce the risks of future physical abuse of the children. Gildea also recommended marital therapy sessions and encouraged both mother and father to "explore events leading up to the removal of the children from their care and the decisions, actions and responses they exhibited that may have contributed to this outcome." Additionally, Gildea recommended ongoing parenting classes and "one-on-one parenting coaching."

Mother did complete some of DHS's recommended actions, including an anger management program and parenting classes. Mother participated regularly in structural family therapy from March 2014 to September 2014. She also engaged in supervised visitation with her children during most of this time period.[4]

Mother attended individual therapy sessions from November 2013 through May 2014. After a brief return to individual therapy, however, mother eventually stopped attending individual therapy sessions with the therapist referred by DHS. After December 2014, mother sought individual therapy with other therapists and counseling from individuals at her church. Mother, however, refused to sign a consent form to allow DHS to access her therapy records, which prevented DHS from being able to monitor mother's therapeutic progress after December 2014.

From September 2014 to December 2014, mother ceased all contact and communication with DHS. During this time period, DHS employees attempted to contact mother and father

---

[4] DHS suspended mother and father's visitation on May 23, 2014, due to an allegation of sexual abuse involving the children. Supervised visitation was resumed in July 2014 after the allegation was determined to be unfounded.

through telephone calls, letters, and unannounced visits to their home and church.[5] Although DHS informed mother through letters and voicemail messages that services were still available to her, she failed to respond to DHS or attend any meetings involving her children. Mother also stopped participating in structural family therapy during this time period. Mother's supervised visitation with the children was also suspended due to a series of sexual abuse allegations.[6]

Without any assistance from mother and father, DHS located James and Melissa Lang, the maternal uncle and aunt of the children.[7] The Langs agreed to be relative placements for the children. On November 3, 2014, M.H.1 and M.H.4 were placed with the Langs. DHS later placed M.H.2 and M.H.3 with the Langs in September 2015.

In December 2014, DHS determined that mother and father had failed to remedy the conditions that led to the children's placement in foster care. As a result, DHS recommended that the goal of the children's foster care plans should be changed to adoption. DHS then filed petitions to terminate mother's residual parental rights regarding the children.

Mother resumed structural family therapy in February 2015. Mother then participated in structural family therapy for the final time in October 2015. Mother continued to participate in individual therapy until May 2016, but records suggested that this therapy primarily consisted of marriage counseling.

---

[5] A Court-Appointed Special Advocate ("CASA") involved in this case also unsuccessfully attempted to contact mother and father through similar methods.

[6] DHS suspended mother and father's visitation on August 29, 2014, following additional allegations of sexual abuse. Although these allegations were also determined to be unfounded, DHS did not resume visitation between mother and the children following the additional complaints.

[7] The record indicates that DHS independently identified and located the Langs as candidates to be relative placements for the children. It is also apparent from the record that the relationship between Mr. Lang (mother's brother) and mother had become estranged.

On January 13, 2015, the juvenile and domestic relations district court ("JDR court") approved DHS's request to change the goal of the children's foster care plans to adoption. The JDR court, however, maintained the concurrent goal of relative placement in the children's foster care plans. At some point after January 13, 2015, the Langs expressed their desire to adopt all of mother's children. DHS and the Langs both believed that adoption would provide a more stable environment for the children. On July 13, 2015, the JDR court entered an order that made adoption the only goal of the children's foster care plans, eliminating the concurrent goal of relative placement.

On September 15, 2015, the JDR court terminated mother's residual parental rights regarding her four children pursuant to Code § 16.1-283(C)(2). The JDR court determined that clear and convincing evidence established that mother had failed to substantially remedy the conditions that led to her children's placement in foster care. The JDR court also terminated father's residual parental rights for the same reason. Mother appealed the JDR court's termination decisions, as well as the JDR court's decisions pertaining to her children's permanency and foster care plans, to the circuit court.

Mother filed a motion to dismiss the petitions before the circuit court. Previously, on October 29, 2013, DHS had filed emergency removal petitions with the JDR court seeking to remove the children from the home of mother and father based on evidence of physical abuse. Those petitions were signed by Diane Loftin, a non-attorney employee of DHS. Later, on December 12, 2014, DHS petitioned the JDR court to terminate mother's parental rights. Those petitions were signed by Marenda Paul, a non-attorney employee of DHS. In her motion to dismiss, mother argued that "the petitions filed by Loftin and Paul are invalid and not legally binding" pleadings because they were signed by non-attorneys. Mother argued that the circuit court lacked jurisdiction on that basis. After a hearing, the circuit court denied mother's motion to dismiss.

Mother also filed a motion to quash a subpoena *duces tecum*. The subpoenas in question were served on health care providers who provided individual therapy and marriage counseling services to mother and father after both parties stopped attending therapy with the therapist referred to them by DHS. In her motion, mother argued, "The information sought to be compelled by the subpoena *duces tecum* is protected as a privileged communication under Va. Code Section 8.01-399, Va. Code Section 8.01-400.2, and Va. Code Section 32.1-127.1:03(H), the patient privacy provisions of the Health Insurance Portability and Accountability Act (HIPAA)." After hearing argument from the parties, the circuit court denied mother's motion to quash. Although it denied her motion, the circuit court ordered that the mental health records could only be used for the purposes of that particular case.

The final two-day hearing was held on July 29, 2016 and August 1, 2016. While DHS's witnesses stated that mother had satisfied several requirements of the foster care plans, they consistently testified that mother had failed to make substantial progress towards eliminating the risks she posed to her children that led to the children's placement in foster care.

Marcella Hollingsworth, a family engagement specialist who worked with both mother and father, testified that DHS was uncomfortable with mother's lack of progress in structural family therapy. Specifically, Hollingsworth was concerned about mother's inability to take responsibility for the circumstances that required the children to be moved into foster care. She testified that a demonstration of therapeutic progress was a crucial step towards reducing the risks of physical abuse to mother's children. She also noted in her testimony that mother repeatedly denied that any physical abuse had occurred in her home – a circumstance that showed that mother had developed "little insight" into addressing and resolving the risk factors for physical abuse. Finally, Hollingsworth testified – without objection – that she believed that the termination of mother's parental rights was in the best interests of the children.

Christina Riley, mother's structural family therapist, testified that one of the most important goals of structural family therapy is "to provide the family a safe place to work on reducing risk factors" related to physical abuse. She testified that mother ceased her participation in structural family therapy after mother missed a scheduled appointment in January 2016. Riley concluded in her testimony that she had not observed any real progress from mother towards eliminating the conditions that led to the placement of her children in foster care. Finally, Riley also testified – without objection – that she believed that the termination of mother's parental rights was in the best interests of the children.

At the conclusion of DHS's evidence, mother moved to strike the evidence that had been presented by DHS. The circuit court denied the motion. Mother then testified on her own behalf. She claimed that, when she first learned of the injuries to M.H.3's face, she believed that the injuries were the result of an accidental fall. She claimed that she only learned the truth after father confessed to her that he had struck M.H.3 in the face. On cross-examination, mother admitted that she had "popped [her] children in the mouth" as a form of punishment on a daily basis, but she claimed that she would no longer use such disciplinary techniques.

At the conclusion of all evidence, DHS urged the circuit court to terminate mother's residual parental rights due to her failure to remedy the conditions that led to her children's placement in foster care. The guardian *ad litem* for the children joined DHS's position. The circuit court agreed with DHS and the guardian *ad litem* and terminated mother's residual parental rights pertaining to all of her children. The circuit court also approved the permanency and foster care plans recommending adoption for each of the children. This appeal followed.

On September 6, 2016, the circuit court entered orders terminating mother's parental rights, permanency planning orders, and the foster care review orders for each child. Mother had previously filed her notice of appeal on September 1, 2016. The notice of appeal failed to include

the circuit court case numbers for the four termination of parental rights cases that had been decided by the circuit court. However, it did state that mother was appealing "the final judgment of the Newport News Circuit Court entered on or about September 1, 2016, which approved a foster care plan goal of adoption and terminated [mother's] parental rights with respect to her biological children." DHS and the guardian *ad litem* for the minor children filed a motion to dismiss mother's appeal as moot, arguing that mother had failed to appeal the final orders from cases where the circuit court actually terminated her residual parental rights.

## II. ANALYSIS

### A. DHS's Motion to Dismiss

On February 6, 2017, DHS filed a motion to dismiss mother's appeal. In its motion, DHS argued that mother's appeal should be dismissed due to her failure to list the case numbers of the termination cases in her notice of appeal. DHS correctly notes that mother's notice of appeal failed to list the case numbers corresponding to the termination of parental rights cases from the circuit court. Instead, the notice of appeal lists the case numbers for the cases pertaining to her children's permanency planning and foster care review cases. However, upon review of mother's notice of appeal and the applicable law, we find that mother's notice of appeal adequately identified the cases that she intended to appeal to this Court. Therefore, we deny DHS's motion to dismiss.

Although there are many rules and relevant statutes governing notices of appeal, this Court has said that:

> "[N]ot every requirement of the rule prescribing when and how a notice of appeal is to be prepared and filed implicates the court's initial acquisition of jurisdiction. Thus, we have never required that the notice of appeal be precise, accurate, and correct in every detail before the appellate court can acquire jurisdiction over the case in which the notice is filed."

Evans v. Commonwealth, 61 Va. App. 339, 344-45, 735 S.E.2d 252, 254 (2012) (quoting

Ghameshlouy v. Commonwealth, 279 Va. 379, 391, 689 S.E.2d 698, 704 (2010)). "[T]wo

aspects of a notice of appeal are mandatory substantive requirements: a notice of appeal must be

timely filed, and it must 'adequately identif[y] the case to be appealed.'" Id. at 345, 735 S.E.2d

at 254-55 (quoting Roberson v. Commonwealth, 279 Va. 396, 407, 689 S.E.2d 706, 712-13

(2010)). "Any defect in the notice of appeal that does not touch on its timeliness or the identity

of the case to be appealed is procedural only." Roberson, 279 Va. at 407, 689 S.E.2d at 713.

Thus, any error that is procedural only does not deprive this Court of active jurisdiction nor

mandate dismissal of the appeal. Evans, 61 Va. App. at 345, 735 S.E.2d at 254-55. "As a

general rule, insubstantial defects in a timely filed appeal 'should not be fatal where no genuine

doubt exists about who is appealing, from what judgment, to which appellate court.'" Id. at 344,

735 S.E.2d at 254 (quoting Christian v. Va. Dep't of Soc. Servs., 45 Va. App. 310, 315, 610

S.E.2d 870, 872 (2005)).

DHS is correct that mother's notice of appeal failed to list the corresponding case numbers

to the termination of parental rights cases in the circuit court. However, the notice of appeal does

clearly state that mother intended to appeal the circuit court's rulings terminating her parental rights.

In the body of the notice of appeal, mother stated:

> CRYSTAL HOUSTON hereby appeals to the Court of Appeals of
> Virginia the final judgment of the Newport News Circuit Court
> entered on or about September 1, 2016, which approved a foster care
> plan of adoption and terminated Houston's parental rights with
> respect to her biological children, [M.H.1, M.H.2, M.H.3, and
> M.H.4].

We conclude that this express reference to the termination of parental rights decisions

sufficiently indicated that mother intended to appeal those decisions. Thus, we find that

mother's notice of appeal "adequately identif[ied]" the termination cases as cases to be appealed

to this Court.  See Evans, 61 Va. App. at 345, 735 S.E.2d at 255.  Therefore, we deny DHS's motion to dismiss this case.

B.  Mother's Motion to Dismiss Petitions Filed by Non-Attorney DHS Employees

In her first assignment of error, mother argues that the circuit court erred when it denied her motion to dismiss the petitions filed by DHS.  She contends that those petitions were legal nullities because they were signed by non-attorney employees of DHS, instead of licensed attorneys.

The legal issue raised in mother's first assignment of error is controlled by this Court's decision in Rudolph v. City of Newport News Dep't of Human Servs., 67 Va. App. 140, 793 S.E.2d 831 (2016).  Much like in this case, the appellants in Rudolph alleged that the circuit court lacked jurisdiction to hear the matters below because DHS's petitions were not signed by an attorney.  Id. at 143-44, 793 S.E.2d at 833.  This Court disagreed and found that "the intent of the General Assembly has been to allow employees of local departments of social services to sign form petitions on behalf of their employer department of social services, provided that those petitions are form petitions approved for use by the Supreme Court."  Id. at 149, 793 S.E.2d at 836.  Because the pleadings in Rudolph were form petitions approved by the Supreme Court, this Court found that the pleadings did not constitute the unauthorized practice of law and held that the lower courts did acquire active jurisdiction to adjudicate the matters below.  Id. at 150, 793 S.E.2d at 836.

The present case is indistinguishable from Rudolph.  Like in Rudolph, social workers employed by DHS signed petitions regarding the welfare of children and filed them on behalf of their employer.  These petitions were form petitions approved for use by the Supreme Court of Virginia.  Therefore, this Court concludes, as we did in Rudolph, that pleadings in this matter that were signed by non-attorney employees of DHS were valid pleadings that did not deprive the circuit court of active jurisdiction to adjudicate the proceedings below.

- 11 -

C.  Mother's Motion to Quash the Subpoena *Duces Tecum*

In her second assignment of error, mother argues that the circuit court abused its discretion in denying the motion to quash the subpoena *duces tecum* for her medical and mental health records.  Mother argues that the information sought was irrelevant to the court proceeding and argues that her mental condition was not shown by DHS to be "truly at issue" in this case.

"[W]e review a trial court's decision regarding a motion to quash the issuance of a subpoena *duces tecum* 'under an abuse of discretion standard.'" Schwartz v. Commonwealth, 45 Va. App. 407, 450, 611 S.E.2d 631, 652 (2005) (quoting America Online, Inc. v. Anonymous Publicly Traded Co., 261 Va. 350, 359, 542 S.E. 2d 377, 382 (2001)).  "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." Thomas v. Commonwealth, 44 Va. App. 741, 753, 607 S.E.2d 738, 743, adopted upon reh'g en banc, 45 Va. App. 811, 613 S.E.2d 870 (2005).

Code § 32.1-127.1:03 governs the privacy health records generally.  Code § 32.1-127.1:03(H) describes the requirements of a subpoena *duces tecum* for another party's health records.  Code § 32.1-127.1:03(H)(6) addresses a motion to quash a subpoena *duces tecum*.  That subsection states, in relevant part:

> In the event that the individual whose health records are being sought files a motion to quash the subpoena, the court or administrative agency shall decide whether good cause has been shown by the discovering party to compel disclosure of the individual's health records over the individual's objections. In determining whether good cause has been shown, the court or administrative agency shall consider
>
> (i)  the particular purpose for which the information was collected;
>
> (ii)  the degree to which the disclosure of the records would embarrass, injure, or invade the privacy of the individual;
>
> (iii)  the effect of the disclosure on the individual's future health care;

(iv)  the importance of the information to the lawsuit or proceeding; and

(v)  any other relevant factor.

Code § 32.1-127.1:03(H)(6).

Upon review, we find that mother has not met her burden of establishing that the circuit court abused its discretion when it denied her motion to quash the subpoena *duces tecum*.  After mother's children were removed from her home and placed in foster care, mother was required to participate in multiple types of therapy.  These therapeutic sessions were designed to reduce the risk of exposing mother's children to physical abuse.  Thus, as a condition of the children's foster care service plans, mother was required to participate in both structural family therapy and individual therapy.  Mother was also required to sign consent forms to allow DHS to receive updates and reports from her therapists.

On appeal, mother argues that her mental health records were not relevant to the proceedings in the circuit court.  However, contrary to mother's claim, the records that were the subject of the subpoena *duces tecum* were necessary for DHS to determine whether mother was actually participating in therapy and whether mother was making progress towards her ultimate goal of eliminating the conditions that led to her children's placement in foster care.  It is clear from the record that mother stopped attending individual therapy with the therapist referred to her by DHS.  After mother stopped seeing that therapist, she failed to sign consent forms that would allow DHS access to any health records created by her new therapists.  Therefore, mother's failure to sign updated consent forms made it practically impossible for DHS to verify mother's compliance with her children's foster care service plans.  Consequently, we disagree with mother's contention that her mental health records were irrelevant to the proceedings in the circuit court.  See Code § 32.1-127.1:03(H)(6)(iv).

- 13 -

In addition, in the circuit court's order denying mother's motion to quash, the court ordered that "any records received pursuant to the subpoena *duces tecum* shall only be used for the purposes of the case(s) before the Court and shall not be further disseminated to any third parties not a party to these proceedings." Thus, the record contains clear evidence that the circuit court took affirmative steps to protect the privacy of mother's mental health records in a manner consistent with Code § 32.1-127.1:03(H)(6)(ii) ("the court . . . shall consider . . . the degree to which the disclosure of the records would embarrass, injure, or invade the privacy of the individual"). For all of these reasons, we cannot say that the circuit court abused its discretion when it found good cause to compel disclosure of mother's mental health records and denied mother's motion to quash the subpoena *duces tecum*.

### D. Termination of Mother's Parental Rights

In her third and final assignment of error, mother appeals the termination of her residual parental rights. Mother argues that the evidence did not establish that she had failed to substantially remedy the conditions that led to her children's placement in foster care and that the evidence failed to establish that the termination of her residual parental rights was in the best interests of the children.[8]

"In matters of a child's welfare, [circuit] courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." Thach v.

---

[8] In Mother's third assignment of error, she also contends that the evidence failed to prove that "there was no less drastic alternative than termination." However, she advances no argument at all to support this contention. Rule 5A:20(e) requires an appellant's opening brief to contain "the argument (including principles of law and authorities) relating to each assignment of error." "[W]hen a party's 'failure to strictly adhere to the requirements of Rule 5A:20(e)' is significant, 'the Court of Appeals may . . . treat a question presented as waived.'" Parks v. Parks, 52 Va. App. 663, 664, 666 S.E.2d 547, 548 (2008) (quoting Jay v. Commonwealth, 275 Va. 510, 520, 659 S.E.2d 311, 317 (2008)). "Statements unsupported by argument, authority, or citations to the record do not merit appellate consideration." Atkins v. Commonwealth, 57 Va. App. 2, 20, 698 S.E.2d 249, 258 (2010) (quoting Buchanan v. Buchanan, 14 Va. App. 53, 56, 415 S.E.2d 237, 239 (1992)). As Mother provided no legal argument to support this particular contention, and we find this omission significant, we conclude that she has waived this issue.

Arlington Cty. Dep't of Human Servs., 63 Va. App. 157, 168, 754 S.E.2d 922, 927 (2014) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)). "When reviewing a decision to terminate parental rights, we presume the circuit court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 265-66, 616 S.E.2d 765, 769 (2005) (quoting Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)). "Where the circuit court's judgment is based on evidence heard *ore tenus*, its decision to terminate a parent's rights is entitled to great weight and [the decision] 'will not be disturbed on appeal unless [it is] plainly wrong or without evidence to support it.'" Thach, 63 Va. App. at 168-69, 754 S.E.2d at 927-28 (quoting Logan, 13 Va. App. at 128, 409 S.E.2d at 463).

Mother's parental rights were terminated pursuant to Code § 16.1-283(C)(2). Code § 16.1-283(C)(2) permits a circuit court to terminate residual parental rights when:

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2) then states:

> Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a public or private social, medical, mental health or other rehabilitative agency shall constitute *prima facie* evidence of this condition. The court shall take into consideration the prior efforts of such agencies to rehabilitate the parent or parents prior to the placement of the child in foster care.

Pursuant to Code § 16.1-283(C)(2) termination decisions "hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Toms, 46 Va. App. at 271, 616 S.E.2d at 772 (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)). Thus, subsection C requires the circuit court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services.[9] Id.

In this matter, the circuit court determined that mother had failed to remedy the conditions that led to her children's placement in foster care and that the termination of her parental rights was in the best interests of the children. We find that these conclusions were not plainly wrong or unsupported by the evidence.

First, we review the circuit court's determination that mother had failed to remedy the conditions that led to her children's placement in foster care. In this matter, the children were removed from mother and father's home upon the discovery of the physical abuse of M.H.3 (who was six years old at the time) in October 2013. M.H.3's injuries were significant enough that he had to miss two days of school. Furthermore, numerous allegations of additional abuse were voiced by her children while they were in foster care. Mother's psychological and parenting capacity evaluation concluded that mother posed "an ongoing high risk" of engaging in the physical abuse of her children and of failing to protect her children from physical abuse from father.

To address the risk of physical abuse that mother posed to her children, DHS recommended that she take parenting and anger management classes and participate in several

---

[9] Mother has not alleged that DHS failed to offer or provide her with "reasonable and appropriate" services designed to help her "substantially remedy the conditions which led to or required continuation of the child's foster care placement." See Code § 16.1-283(C)(2).

- 16 -

types of therapy. Jennifer Gildea, the clinical psychologist who conducted mother's psychological and parenting capacity evaluation, also recommended that mother participate in individual and family therapy services "in order to reduce risks for future episodes of abuse toward or failure to protect the children."

Despite the recommendations of her parenting capacity assessment and the requirements of her children's foster care plans, mother eventually stopped participating in therapy. Mother was referred to structural family therapy in March 2014. However, mother did not participate in structural family therapy from September 2014 through February 2015. While mother did temporarily resume her participation in structural family therapy in February 2015, she quit participating and never returned starting in October 2015 – one month after the JDR court terminated her parental rights.

Mother also stopped attending individual therapy in January 2015. While mother reported that she was receiving some therapy and counseling through her church, mother had refused to provide a consent form to DHS to allow the agency to assess her progress. Accordingly, DHS was not able to monitor mother's participation in individual therapy or to measure her therapeutic progress after December 2014. Although the records obtained through the subpoena *duces tecum* at issue in this case suggested that mother participated in individual therapy until May 2016, the records also suggested that this therapy primarily consisted of marriage counseling rather than therapy specifically structured to reduce her risk factors for physical abuse which led to the children's placement in foster care.

Mother is correct that she did complete some of the requirements of her children's foster care plans, including an anger management program and parenting classes. However, DHS's witnesses testified that mother had failed to successfully complete her recommended therapy services or fully commit to her children's foster care plans. Marcella Hollingsworth, mother's

family engagement specialist, testified that DHS was uncomfortable with mother's lack of progress in structural family therapy – specifically mother's inability to take responsibility for the circumstances that required the children to be moved into foster care. Christina Riley, mother's structural family counselor, testified that she had not observed any real progress from mother towards the goal of eliminating the conditions that led to the placement of her children in foster care. Jennifer Gildea, mother's licensed clinical psychologist, testified that a demonstration of therapeutic progress was a crucial step toward reducing the risks of physical abuse to mother's children. In addition, mother herself testified that she had "popped [her] children in the mouth" as a form of punishment on a daily basis.

Based on the totality of the evidence presented at the termination hearing, the circuit court reasonably concluded that mother had failed to remedy the conditions that led to her children's placement in foster care. Despite the numerous services offered to mother throughout the nearly three-year period that her children had been in foster care,[10] she demonstrated a lack of progress towards the goal of addressing the problems that created the original danger to the children. In addition, mother's sporadic participation in the required therapy and her refusal to accept responsibility for the physical abuse of her children implied that she had failed to make substantial therapeutic progress.[11] As the finder of fact, the circuit court could have inferred from this evidence that mother continued to pose a risk of physical harm to her children. For

---

[10] "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

[11] We note that mother's failure to make substantial therapeutic progress in accordance with the goals of her children's foster care plans constituted *prima facie* evidence that she had failed to remedy the conditions that led to her children's placement in foster care. See Code § 16.1-283(C)(2).

these reasons, we cannot say that the circuit court was plainly wrong when it determined that the requirements of Code § 16.1-283(C)(2) had been satisfied.

Furthermore, the circuit court reasonably determined that the termination of mother's residual parental rights was in the best interests of the children.

> In determining what is in the best interests of the child, the circuit court must evaluate and consider many factors: the age and physical and mental condition of the child; the age and physical and mental condition of the parent; the relationship existing between the parent and the child; the needs of the child; the role the parent has played, and will play in the future, in the upbringing and care of the child; and any other such factors that are necessary.

Thach, 63 Va. App. at 169, 754 S.E.2d at 928.

In the present case, the circuit court concluded that mother had failed to remedy the conditions that led to her children's placement in foster care and that she continued to pose a risk to the children. Based on the evidence presented by DHS, mother posed "an ongoing high risk" of engaging in physical abuse of her children and of failing to protect her children from physical abuse by father.

Moreover, the evidence at the termination hearing established that mother's children were living in stable foster care placements with relatives, their aunt and uncle, who wanted to adopt them. Selena Marrow-Smith, the case manager at DHS assigned to mother's children, testified that the Langs were "very committed" to the children being in their home. She testified that the children had adjusted well to living with the Langs and that the Langs were meeting their physical, social, and emotional needs. Marrow-Smith also testified that, after being placed with the Langs, the children had made progress towards addressing their behavioral and psychological issues. Based on this evidence, the circuit court found that the adoption of the children by the Langs would provide them with a caring, stable, and permanent home. Under these

circumstances, we cannot say that the circuit court was plainly wrong when it determined that termination of mother's residual parental rights was in the children's best interests.

In summary, the totality of the evidence from the record supports the circuit court's finding that mother had failed, without good cause, to remedy the conditions which necessitated the children's foster care placement within a reasonable amount of time pursuant to Code § 16.1-283(C)(2). In addition, the evidence also supported the circuit court's conclusion that the termination of mother's parental rights was in the children's best interests. Accordingly, we find that the circuit court did not err when it terminated mother's residual parental rights,[12] and we affirm the judgment of the circuit court.

### E. Age of Discretion of Mother's Oldest Children

As part of her third assignment of error, mother argues that the circuit court erred by finding, in the absence of any evidence, that M.H.1 and M.H.2 were not of the age of discretion to object to the termination of mother's parental rights pursuant to Code § 16.1-283(G). Code § 16.1-283(G) states:

> Notwithstanding any other provisions of this section, residual parental rights shall not be terminated if it is established that the child, if he is 14 years of age or older or otherwise of an age of discretion as determined by the court, objects to such termination. However, residual parental rights of a child 14 years of age or older may be terminated over the objection of the child, if the court finds that any disability of the child reduces the child's developmental age and that the child is not otherwise of an age of discretion.

---

[12] As the evidence was sufficient to support the circuit court's decision to terminate mother's residual parental rights pursuant to Code § 16.1-283(C)(2), it was also sufficient to support the circuit court's decisions to enter permanency planning orders with the goal of adoption and to approve the foster care plans with the goal of adoption. See Najera v. Chesapeake Div. of Soc. Servs., 48 Va. App. 237, 241, 629 S.E.2d 721, 722 (2006) ("A preponderance-of-the-evidence standard governs judicial review of the foster care plan recommendations, while the more stringent clear-and-convincing-evidence standard applies to the ultimate termination decision."). We also note that the evidence supported the denial of mother's motion to strike.

In support of this argument, mother relies on the Supreme Court's decision in Deahl v. Winchester Dept. of Social Services, 224 Va. 664, 299 S.E.2d 863 (1983) and this Court's decision in Hawks v. Dinwiddie Dept. of Social Services, 25 Va. App. 247, 252, 487 S.E.2d 285, 287 (1997). Mother argues that the Supreme Court's decision in Deahl and this Court's decision in Hawks placed a burden on DHS to produce evidence concerning the wishes of M.H.1 and M.H.2 with regard to the termination of the parental rights of mother. She also argues that the court committed reversible error by not taking evidence of M.H.1 and M.H.2's wishes and then "simply presuming in the absence of evidence that the thirteen-year-old and twelve-year-old had not attained an age of discretion." We disagree.

Both Deahl and Hawks are readily distinguishable from the case now before us on appeal. The parents in Deahl challenged "the trial court's ruling that [the thirteen-year-old child] could not be asked whether he approved of the termination." 224 Va. at 674, 299 S.E.2d at 868. Unlike the children in this matter, the child in Deahl was present and testified at the termination hearing. Id. at 669-70, 299 S.E.2d at 865-66. The Supreme Court in Deahl held that the circuit court erred because it *prohibited* the thirteen-year-old child from testifying on whether he approved or disapproved of the termination without first ruling on whether the child was of the "age of discretion." Id. at 675-76, 299 S.E.2d at 869. In contrast, mother never called M.H.1 or M.H.2 to testify, so mother's children were not even present at the final hearing. Thus, unlike with the parents in Deahl, mother was never denied the opportunity at trial to have any of her children state his or her objection to the termination proceedings because the children were not called as witnesses at trial.

Likewise, in Hawks, this Court stated, "In cases *in which the testimony of a child younger than fourteen is sought*, the determination of whether or not the child has reached an 'age of discretion' is committed to the sound discretion of the trial court." 25 Va. App. at 253, 487

S.E.2d at 288 (emphasis added).  Thus, a party must first offer the testimony of a child under the age of fourteen in order to trigger any obligation of the circuit court to determine whether that child has reached an "age of discretion."  In Hawks, this Court reversed the circuit court because, unlike in the case now before us, the circuit court in Hawks had "refused to allow [Hawks] to secure [the] child's presence in court so that [the child] could state his opinion regarding the termination proceeding."  Id. at 252, 487 S.E.2d at 287.

Code § 16.1-283 and the cases applying that statute make it clear that that the circuit court may not terminate the residual parental rights of a parent "if it is established that the child, if he is 14 years of age or older or otherwise of an age of discretion as determined by the court, objects to such termination."  Code § 16.1-283.[13]  In the present matter, however, it is uncontroverted that neither M.H.1 nor M.H.2 had reached the age of fourteen as of the date of the final hearing on termination of parental rights (M.H.1 was thirteen years old and M.H.2 was twelve years old at the time of the final termination hearing).

At the final termination hearing, mother never sought testimony from either M.H.1 or M.H.2 regarding any objections they might have to the termination proceedings.  While mother argued that DHS was required to bring M.H.1 and M.H.2 into court to determine whether they had reached "an age of discretion," the circuit court rejected mother's argument, stating:

> So in theory, what you'd say is there's a burden upon the City in every one of these cases to bring every single child in here, regardless of age, and put them up on the witness stand so that we can decide they're of an age of discretion to make this decision.  If somebody has an obligation to do that, it would be the parents.  And they can certainly do that by subpoena, and that has not been done.

---

[13] The circuit court may also terminate the residual parental rights of a child fourteen years of age or older over the objection of the child "if the court finds that any disability of the child reduces the child's developmental age and that the child is not otherwise of an age of discretion."  Code § 16.1-283(G).

We agree with the circuit court. This matter is distinguished from <u>Deahl</u> because the circuit court below never prohibited one of mother's children from testifying about that child's opinion regarding the termination proceeding. The present matter is similarly distinguished from <u>Hawks</u> because the circuit court below never prevented mother from bringing either M.H.1 or M.H.2 into the circuit court to present testimony regarding his or her opinion about the termination of mother's parental rights. The circuit court correctly noted that mother had every opportunity to bring her children into court to testify, but elected not to do so. For all of these reasons, we find that the circuit court did not err when it found that all four of mother's children were not fourteen years old or older or otherwise of an age of discretion.

### III. CONCLUSION

In summary, the Court denies DHS's motion to dismiss this case because mother's notice of appeal adequately identified the cases that she intended to appeal. We hold, pursuant to this Court's decision in <u>Rudolph</u>, that the signatures of the non-attorney DHS employees on the form petitions that were approved by the Supreme Court did not invalidate DHS's termination petitions or deprive the circuit court of jurisdiction to adjudicate these matters. We also find that the circuit court did not err in denying mother's motion to quash the subpoena *duces tecum* regarding her mental health records. Finally, we hold that the evidence presented in this case satisfied the criteria set forth in Code § 16.1-283(C)(2), and therefore, adequately supported the circuit court's decision to terminate mother's residual parental rights for each of her four children. For all of these reasons, we affirm the circuit court.

<u>Affirmed.</u>