UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, O'Brien and Malveaux
Argued at Richmond, Virginia

ALONZO TROY ROANE

MEMORANDUM OPINION* BY
v.     Record No. 0058-18-2     JUDGE MARY BENNETT MALVEAUX
DECEMBER 4, 2018

HALIFAX COUNTY DEPARTMENT OF
 SOCIAL SERVICES

FROM THE CIRCUIT COURT OF HALIFAX COUNTY
Kimberley S. White, Judge

James C. Martin (Martin & Martin Law Firm, on briefs), for
appellant.

Matthew W. Evans; Elizabeth Blair Trent, Guardian *ad litem* for the
minor child (Gravitt Law Group, P.L.C.; The Trent Law Practice,
PLC, on brief), for appellee.

The Circuit Court of Halifax County ("circuit court") entered an order terminating the

residual parental rights of Alonzo Troy Roane ("father") to his daughter, A.R. Father appeals

that order, arguing that the circuit court erred in terminating his rights because he committed no

abuse or neglect and the evidence was insufficient to support termination. For the following

reasons, we affirm the circuit court.

I. BACKGROUND

We review the evidence in the light most favorable to the Halifax County Department of

Social Services ("DSS"), the party that prevailed before the circuit court, affording it all

inferences fairly deducible therefrom. See Bristol Dep't of Soc. Servs. v. Welch, 64 Va. App.

34, 40, 764 S.E.2d 284, 287 (2014).

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Father and Spring Bryant ("mother") are the biological parents of A.R., who was born in 2011. Father and mother also had a son, A., who was a year or two younger than A.R. DSS became involved with the family in January 2016. At that time, father lived in Florida and the children lived in Virginia with mother and Terence Bryant ("Bryant"). DSS received a complaint alleging that mother and Bryant were physically abusing A. After DSS began an investigation, mother removed A. and A.R. from school, and the children began living with Bryant's mother in a neighboring county.

In February 2016, Bryant's mother beat A. to death. A.R. witnessed the killing and saw her brother's body being placed in a trash bag in the back of a car. DSS learned of A.'s death and filed an emergency removal petition for A.R., who was placed in foster care. DSS did not attempt to place A.R. with father at that time because they were unaware of him. However, during the investigation of A.'s death, DSS learned of father and that he was living in Florida.

Father attended a May 4, 2016 hearing, following which the Halifax Juvenile and Domestic Relations District Court ("J&DR court") entered an adjudicatory order finding that A.R. had been abused and neglected by her parents as defined in Code § 16.1-228(1).[1] Specifically, the J&DR court found that A.R.'s "sibling was killed by an unsuitable person the parents left the children with, in an unsuitable house and i[n] what appeared to be an effort . . . to hide [the] children from authorities. [The] [c]hildren were unclean, under[]nourished and neglected." Two days later, following a hearing at which father was present, the J&DR court entered a dispositional order approving DSS's foster care plan. The plan stated that A.R. would

---

[1] Code § 16.1-228(1) provides, in pertinent part, that an abused or neglected child is one whose "parents . . . create[] or inflict[] . . . , or allow[] to be created or inflicted upon such child a physical or mental injury by other than accidental means, or create[] a substantial risk of death, disfigurement or impairment of bodily or mental functions . . . ."

remain in DSS's custody with the goal of returning her to her home or placing her with a relative. Father did not appeal the dispositional order.

DSS initiated a study of father's Florida home through the Florida Department of Children and Families. While the study was underway, DSS filed a foster care review plan in July 2016. The plan noted that A.R. was receiving therapy and had told her therapist of alleged abuse by family members. It also noted that A.R. had not seen father for more than a year and a half prior to her foster care placement and that father had not contacted DSS since the dispositional hearing nearly three months earlier. While some of A.R.'s maternal relatives had filed for custody, none of their petitions had yet been fully evaluated. The review plan concluded that no progress had been made toward the goal of returning A.R. to her home.

In September 2016, father attended a foster care review hearing. At the hearing, the J&DR court found that DSS had made reasonable efforts to pursue the goals of the foster care plan and continued A.R.'s foster care placement.

Later that month, DSS received the home study from the Florida Department of Children and Families. The review indicated that father was living with a girlfriend with whom he had been involved for several years on an on-and-off basis. Father reported that had not seen A.R. since July 2014 and had last spoken with her by phone in November 2015. Florida officials approved a home placement for A.R. However, DSS had a number of concerns arising from the results of the home study. Tara Toombs, a DSS foster care adoptions worker assigned to A.R.'s case, later testified that these concerns included the small size of the Florida home and father's potential financial and housing instability absent his girlfriend's support. Toombs also noted that A.R.'s therapist had recommended she have no contact with father or mother at that time because of the "strong . . . trauma [A.R.] was dealing with." Toombs also stated that although DSS had emailed with father to initiate the home study and had informed him that he needed to undergo a

psychological and parenting assessment, she did not hear from father after she took over A.R.'s case in April 2016.

During A.R.'s foster care placement she received therapy from Jonci Berneche, a licensed professional counselor. Berneche initially diagnosed A.R. with an adjustment disorder. As the therapy progressed and Berneche learned more about the trauma experienced by A.R., Berneche updated her diagnosis to include post-traumatic stress disorder ("PTSD"). Berneche testified that A.R. shared that she had been abused and identified mother, Bryant, and Bryant's mother as her abusers. As a result of witnessing the abuse and death of A. she experienced abandonment issues, excessive fear, and constantly recurring thoughts and nightmares. Berneche testified that change is a frightening thing for traumatized children and worked with A.R. and her foster parents to establish consistency and a sense of safety in A.R.'s daily life.

Father attended one meeting with Berneche on September 29, 2016. Prior to that meeting Berneche spoke with A.R. about father. At first, A.R. did not remember who father was. When Berneche asked A.R. if she would like to meet him, she said she did not want to. At the meeting with father, Berneche shared her concerns that A.R. did not remember him. She also told father that any change in A.R.'s life would have to be introduced gradually because A.R. "could not handle any additional abrupt transitions." Berneche explained that due to A.R.'s trauma, it was important for father and other individuals who would have contact with her to undergo psychological evaluations; this would help to ensure A.R.'s safety and that nothing would jeopardize her progress or create additional issues for her. Berneche asked father to provide a photograph of himself that she could share with A.R. to help prepare A.R. for any future visitations. A month passed before father emailed a photograph to Berneche. That email, and a brief conversation at a court hearing, during which Berneche reminded father of the importance of undergoing a psychological evaluation, were the only further contacts Berneche had with

- 4 -

father.  Berneche opined that any reunification of A.R. with father would require much time and effort because A.R. would need time to adjust to the change and even small changes could have negative effects on her.  Further, removing A.R. from her foster care family would produce "extreme trauma and could lead to a psychotic break."

In December 2016, Toombs sent father a letter reiterating the need for him to complete a psychological and parenting assessment.  Her letter was returned in February 2017 with a notation indicating that father no longer lived at the Florida address that had been the subject of the home study.  Toombs had not received notification that father was moving or of his new address.  She later acknowledged that arranging for the assessment was complicated by father's presence in Florida, but noted that DSS was willing to work with the situation.  Toombs sent father an email requesting his current address and again expressing the need for him to complete a psychological and parenting assessment.  Father replied that he would be travelling through Virginia later that month, and Toombs arranged for a service provider to "work him in" for an assessment.  However, the night before the scheduled appointment, father left a voice mail message with the service provider saying that he would not be there.  Toombs testified that father never rescheduled the assessment, which would have occurred more than a year after A.R. had been placed in foster care, and that she had made it "very clear" to father that he "had to do [the assessment] in order for us to consider having visits or contact with his daughter."

Toombs emailed father again in June 2017.  She had not heard from him since the February email exchange except for one email exchange in March, and later testified that her communication with father was generally characterized by her reaching out to him after which "he would eventually e[]mail me back later."  In her June 5 email, Toombs asked for father's address and informed him that a new home study would have to be conducted.  She also reiterated the need for a psychological and parenting assessment and told father that it was

"important for him to complete this for him to even be considered an option for [A.R.]."

Toombs also explained that A.R. had been in foster care for almost a year and a half and that DSS "had to have a permanent goal and if [A.R.] could not return home or to a relative, her goal would be changed to adoption." Toombs asked father to contact her and he replied, providing his address and stating that he still wanted to obtain custody of A.R.

On June 28, 2017, DSS petitioned the J&DR court for the termination of father's residual parental rights. In late July, father contacted Toombs about setting up a psychological and parenting assessment. Toombs explained to father that there were no local providers in Halifax County who could perform an assessment and that providers in both Richmond and Lynchburg would be unable to schedule an assessment for several months. She also informed him that if father knew of a service provider in Florida who could perform an assessment sooner, DSS could "try to set that up." Father never responded to Toombs about attempting to set up an assessment in Florida.

Five days before the termination hearing, father obtained a three-page "Mental Health Psychological Assessment" from a licensed mental health counselor in Florida. Toombs testified that the assessment "didn't really say much" and that psychological and parenting assessments normally included greater detail. DSS "had no idea where [father] had gone" for the assessment, "what type of facility it was," or "anything about the person who had done it."

On September 26, 2017, the J&DR court terminated father's residual parental rights pursuant to Code § 16.1-283(C)(1) and (C)(2). Father, who did not appear at the termination hearing, appealed the termination order to the circuit court.

The circuit court conducted a hearing on the matter on January 3, 2018. In addition to the testimony described above, the circuit court also heard testimony from Amanda Cross, A.R.'s foster care mother. Cross stated that in January 2017, at the suggestion of A.R.'s therapist, she

contacted father through Facebook Messenger and told him that she was open to communicating with him. Father responded, but only wanted to talk about court proceedings. Cross told father she wanted him to know about A.R.'s life and sent him photographs of A.R.'s activities. Father sent Cross a message containing a link to a music video and asked Cross to play the video for A.R. After viewing the video herself, Cross declined to show it to A.R. because it was "pornographic" and depicted drug and alcohol use. Cross sent father photographs and a video of A.R.'s birthday celebrations in April 2017, but father did not respond to her message. Cross next heard from father in December 2017 after she sent him a Facebook message containing a photograph of A.R. decorating a Christmas tree. Approximately two weeks after Cross sent the photograph, father responded by sending a "thumbs up" icon. Cross stated that father never messaged her to ask how A.R. was doing and that she had to initiate those conversations herself. Cross also stated that A.R. "doesn't do well with change. Change always sets her back." In her care, although A.R. continued to experience night terrors and separation anxiety, she was doing well in most school subjects and was very involved in church activities and gymnastics.

The circuit court also heard testimony from Kenneth Warfield, a counselor who conducted an assessment of A.R. and counselled her for approximately one year. He concluded that A.R. was suffering from chronic PTSD and panic attacks. Warfield testified that anytime he brought up the names of father or mother, A.R. would "completely retreat[] into almost a coma[-]like state where she shuts down completely, [and] she cannot do day to day activities." When Warfield asked A.R. specifically about father, she stated that he was not her father. Warfield testified that A.R. had developed trust in and attachment to her foster care family. As long as A.R. remained within a circle of trust, "she's okay[,] but when she goes past that circle of trust, she then begins to retreat back into her defense mechanism which is complete shut[]down."

Father also testified in circuit court. He stated that during the proceedings about A.R. he "didn't initiate contact with a lot of people" and instead "just waited until the court date to see what they provided for me . . . . [T]he only contact I ever had was what they told me I needed to do." After cancelling the psychological and parenting assessment arranged for him by DSS, father waited until the next hearing date "to see if they would be able to accommodate me on the way in to coming to court." Father said that A.R.'s foster mother would tell him how A.R. was doing and he would ask her some questions, but that he "never initiated contact" with her. Father testified that he "just waited for court and did whatever I was supposed to do."

The circuit court terminated father's residual parental rights pursuant to Code § 16.1-283(B) and (C)(2). The court found that father

> needed to completely and totally engage in [A.R.'s] life. He needed to do whatever had to be done so that he could step in and . . . be there for this child who now has very significant special needs but he didn't . . . . [His] contact with [DSS] was described as sporadic, [and] was only in response to DSS reaching out. And in those contacts with DSS, [father] never asked them about [A.R.] . . . . [N]otwithstanding the fact that he knew that the home study had to be done so that he could be considered for [A.R.] to come to him, he moved after the home study was done, . . . and he never notified [DSS that] . . . we might have to do another one. It's not incumbent upon [DSS] to know what's going on in his life without him telling them. Then [DSS] . . . were able to move heaven and earth . . . to get him an [assessment] appointment and then [father] . . . cancels it. He didn't ever reach out to [DSS] and say I cancelled the appointment.

Further, despite efforts by A.R.'s foster mother to reach out to father, he was unresponsive and "there were inappropriate links and inappropriate contacts made and never ever did [father] reach out" to enquire about A.R. and ask, "what can I do." Simply put, father "ha[d] not done what was required of him." Both DSS and Berneche "told [father] a year before the psychological evaluation was even done . . . that it was going to have to be done and unless and until he did that, he was not going to be able to have contact with [A.R.] . . . . He waited a year." Father did

not maintain contact with Berneche to ask "how's [A.R.] doing, what can I do, what do you want me to do, do you have someone I should contact to have this psychological evaluation done. None of that was done." While it would require "a lot of effort on everyone's part in order to get [A.R.] where she needs to be, . . . the problem was dad wasn't stepping up to the plate, wasn't doing these extraordinary things that were going to have to be done."

With respect to A.R.'s best interests, the court noted that father had had no physical contact with her for a long period of time and that to minimize or remove the substantial risk to A.R.'s mental health she would need stability, continued counseling, and parents who were equipped to handle trauma and PTSD.

Father appealed the termination order to this Court.

## II.  ANALYSIS

Father argues that the circuit court erred in terminating his residual parental rights because the evidence was insufficient to support termination. He contends that DSS had "given up" on him and that although he eventually underwent a psychological evaluation, DSS failed to offer him services. Father also maintains that he has good cause for his situation, "including at least some of the contact problems. He lives in Florida, and should not automatically lose his child because of that."[2]

---

[2] Father also argues that the circuit court erred in terminating his parental rights because he committed no abuse or neglect and is simply being punished for others' misconduct. We note that father did not appeal the J&DR court's May 6, 2016 dispositional order which followed its May 4, 2016 adjudicatory order finding abuse or neglect by A.R.'s parents. Code § 16.1-278.2(D) establishes that a dispositional order entered by a J&DR court in an abuse or neglect and removal case "is a final order from which an appeal may be taken" to the circuit court. See also Code § 16.1-296(A) (providing, in pertinent part, that an appeal of such an order "may be taken to the circuit court within 10 days from the entry of . . . [such] order"). Because father did not appeal the J&DR court's dispositional order to the circuit court, he has waived any argument respecting the finding of abuse or neglect. We also note that father acknowledged to the circuit court that he did not appeal the J&DR court's dispositional order and stated that the adjudicatory and dispositional orders were a "part of the record" that the court could use "for what it proves."

- 9 -

"When reviewing a termination of a parent's residual parental rights, it would be unfitting to not acknowledge that '[t]he termination of parental rights is a grave, drastic and irreversible action.'" Farrell v. Warren Cty. Dep't of Soc. Servs., 59 Va. App. 375, 400, 719 S.E.2d 329, 341 (2012) (alteration in original) (quoting Helen W. v. Fairfax Cty. Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991)). However, "[w]hile recognizing the seriousness of such a determination, we must presume that the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's . . . best interests.'" Id. (quoting Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)). Such courts "are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." Thach v. Arlington Cty. Dep't of Human Servs., 63 Va. App. 157, 168, 754 S.E.2d 922, 927 (2014) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)). Consequently, "in a parental rights termination case, '[t]he trial court's judgment, when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Farrell, 59 Va. App. at 401, 719 S.E.2d at 341-42 (alteration in original) (quoting Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 266, 616 S.E.2d 765, 769 (2005)). Further, on appeal this Court "is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 303, 746 S.E.2d 509, 513 (2013).

Here, assuming without deciding that the evidence was insufficient to terminate father's residual parental rights under the provisions of Code § 16.1-283(C)(2), we hold that the circuit court committed no error because the evidence was sufficient to satisfy the termination

requirements of Code § 16.1-283(C)(1).[3]  "In instances where a trial court's decision is correct, but its reasoning is incorrect, and the record supports the correct reason, we uphold the judgment pursuant to the right result for the wrong reason doctrine."  Haynes v. Haggerty, 291 Va. 301, 305, 784 S.E.2d 293, 294 (2016).  See also Fredericksburg Dep't of Soc. Servs. v. Brown, 33 Va. App. 313, 323, 533 S.E.2d 12, 16 (2000).  In such cases, "we will assign the correct reason and affirm that result."  Perry v. Commonwealth, 280 Va. 572, 580, 701 S.E.2d 431, 436 (2010) (quoting Mitchem v. Counts, 259 Va. 179, 191, 523 S.E.2d 246, 253 (2000)).  We may "uphold a judgment even when the correct reasoning is not mentioned by a party in trial argument or by the trial court in its decision, as long as the record contains sufficient information to support the proper reason."  Haynes, 291 Va. at 305, 784 S.E.2d at 294-95.  The record supports a proper alternative ground for affirmance "when it reflects that all evidence necessary to that ground was before the circuit court."  Banks v. Commonwealth, 280 Va. 612, 617, 701 S.E.2d 437, 440 (2010).  Thus, "[c]onsideration of the facts in the record and whether additional factual presentation is necessary to resolve the newly-advanced reason is the . . . focus of the application of the doctrine."  Id. (quoting Perry, 280 Va. at 580, 701 S.E.2d at 436).  Further, "an appellate court's 'examination is not limited to the evidence mentioned by a party in trial argument or by the trial court in its ruling.'  Rather, 'an appellate court must consider all the evidence admitted

---

[3] In so holding we rely upon, as discussed below, the circuit court's extensive consideration of and factual findings with respect to the termination requirements under Code § 16.1-283(C)(1).  We also note the relationship between the requirements for termination under both subsections (C)(1) and (C)(2).  In contrast to the termination requirements of subsection (B), both are "more 'retrospective in nature,'" requiring the court to "determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services."  Toms, 46 Va. App. at 271, 616 S.E.2d at 772.  Thus, unlike termination decisions under subsection (B), "subsection C determinations [both] hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes."  Id.

at trial that is contained in the record.'" Perry, 280 Va. at 580, 701 S.E.2d at 436 (citation

omitted) (quoting Bolden v. Commonwealth, 275 Va. 144, 147, 654 S.E.2d 584, 586 (2008)).

After a child is placed in foster care as a result of court commitment, a court may

terminate the residual parental rights of a parent after making certain findings pursuant to Code

§ 16.1-283(C)(1). First, the court must find that termination is in the best interests of the child.

Code § 16.1-283(C). The court must also find that

> [t]he parent . . . without good cause, [has] failed to maintain
> continuing contact with and to provide or substantially plan for the
> future of the child for a period of six months after the child's
> placement in foster care notwithstanding the reasonable and
> appropriate efforts of social, medical, mental health or other
> rehabilitative agencies to communicate with the parent or parents
> and to strengthen the parent-child relationship.

Code § 16.1-283(C)(1). All of these findings must be made based upon clear and convincing

evidence. Code § 16.1-283(C). Further,

> The statutory language contained in Code § 16.1-283(C)(1)
> requires "reasonable and appropriate" efforts to be made to provide
> services. We must interpret the statutory mandate in accordance
> with the language chosen by the legislature. "Reasonable and
> appropriate" efforts can only be judged with reference to the
> circumstances of a particular case. Thus, a court must determine
> what constitutes reasonable and appropriate efforts given the facts
> before the court.

Tackett, 62 Va. App. at 322-23, 746 S.E.2d at 522 (quoting Ferguson v. Stafford Cty. Dep't of

Soc. Servs., 14 Va. App. 333, 338, 417 S.E.2d 1, 7 (1992)).

Here, the circuit court found that the termination of father's parental rights was in A.R.'s

best interests based upon father's long-standing lack of physical contact with A.R. and her need

for stability, ongoing counseling, and parents equipped to manage her trauma and PTSD. Clear

and convincing evidence supports this finding. Berneche testified that A.R. did not initially

remember who father was. She also stated that A.R. experienced abandonment issues and said

that she did not want to meet father. Warfield testified that A.R. said father was not her father

and that bringing up his name caused A.R. to shut down and lose day-to-day functionality. Further, A.R.'s foster mother and both her counselors testified that managing change was very difficult for A.R. Berneche made clear that A.R. could not handle any additional abrupt transitions and noted the importance of working to establish consistency and a sense of safety in A.R.'s life. Warfield stated that even small changes in A.R.'s life could have negative effects on her. He also stressed that A.R. had developed a circle of trust within her foster care family and that moving A.R. outside that circle would cause her to retreat into her defense mechanism of shutting down. Such a separation, he opined, would cause extreme trauma to A.R. and could cause her to experience a psychotic break. Based upon this evidence, the further involvement of father in A.R.'s life would contradict A.R.'s express wishes and expose her to substantial risk of negative emotional and psychological consequences. Consequently, we hold that the circuit court did not err in finding that the termination of father's parental rights was in the best interests of A.R.

The circuit court also made a number of specific factual findings relevant to whether father, without good cause, failed to maintain continuing contact with A.R. or to provide or substantially plan for her future for a period of six months after she was placed in foster care. The evidence supports these findings. First, the circuit court found that although father attended a hearing shortly after A.R.'s foster care placement and had some contact with DSS at that time, father then needed to completely and totally engage in A.R.'s life but did not. Instead, the court found, father's contact with DSS was sporadic and only in response to outreach by DSS. Toombs testified that after she took over A.R.'s case in April 2016, father did not maintain contact with DSS. Father admitted that he did not initiate contact with many people and that his only contacts were when DSS told him what he needed to do. The court also found that father did not maintain contact with Berneche to ask about A.R.'s progress, enquire how he could assist

with A.R.'s therapy, or find out how he could complete the requisite psychological evaluation. Berneche testified to father's minimal and sporadic contacts and stated that father only met with her once, some seven months after A.R.'s foster care placement. After that meeting, Berneche did not hear from father again, except when he sent her a photograph a month after she requested it and when she briefly saw father at a court hearing. In addition, the circuit court found that although father completed a home study six months after A.R.'s foster care placement, he moved after the study was completed and never notified DSS. Toombs confirmed this, stating that she only learned of father's move six months after the home study when a letter she sent to remind him of the need for a psychological evaluation was returned to her. Further, the court found that DSS made special efforts to arrange a psychological evaluation for father in February 2017. However, father cancelled the appointment the evening before and never informed DSS of the cancellation. Toombs testified that she only learned of the cancellation from the service provider. The circuit court also found that despite Cross's efforts to reach out to father, there were either no responses or "inappropriate links and inappropriate contacts" and father never reached out to enquire about A.R. and ask, "what can I do." Cross testified that she wanted father to know about A.R.'s life in foster care and repeatedly reached out to him by sending him social media messages and photographs of A.R.'s activities. However, Cross always had to initiate these interactions and father either would not reply or would reply weeks later. Father confirmed that although Cross reached out to him to tell him how A.R. was doing in foster care, he never initiated contact with her. Cross also stated that father only wanted to talk to her about court proceedings and that he once sent A.R. a link to a music video which Cross considered inappropriate. We conclude that clear and convincing evidence supports the circuit court's factual findings on these matters. Further, although father argues that his residence in Florida provided good cause for some of his contact problems, we note that Toombs testified that DSS

was willing to work with father's out-of-state status. Consequently, we hold that without good cause father failed to maintain continuing contact with A.R. or to provide or substantially plan for her future for six months after her foster care placement.

Lastly, the record supports a finding that DSS made reasonable and appropriate efforts to communicate with father and strengthen his relationship with A.R. With reference to the particular circumstances of the instant case, it is clear that DSS repeatedly reached out to father to inform him of what steps he would need to take in order for A.R. to be returned to him. It is also clear, as noted above, that father's response to these communications was at best sporadic. Further, DSS actively pursued steps that were intended to make it possible for father to reestablish his relationship with A.R. DSS obtained a home study of father's Florida residence and arranged a psychological evaluation for father. Also as noted above, both A.R.'s counselor and her foster care mother attempted to work with father to begin reestablishing his relationship with A.R. However, father only minimally engaged with these efforts. We hold that based upon these circumstances, clear and convincing evidence supports a finding that DSS met its services obligations to father under the provisions of Code § 16.1-283(C)(1).

We conclude that all the evidence necessary to support the termination of father's residual parental rights under the provisions of Code § 16.1-283(C)(1) was before the circuit court. Thus, assuming without deciding that the evidence was insufficient to terminate father's rights under the provisions of Code § 16.1-283(C)(2), the record supports a proper alternative ground for affirmance under Code § 16.1-283(C)(1). Consequently, we find no error by the circuit court in the termination of father's residual parental rights.[4]

---

[4] The circuit court terminated father's residual rights pursuant to the provisions of both subsections (B) and (C) of Code § 16.1-283. Where the evidence is sufficient to support termination under one subsection of Code § 16.1-283, we need not address the sufficiency of the evidence to support termination under another subsection of the statute. Butler v. Culpeper Cty. Dep't of Soc. Servs., 48 Va. App. 537, 548-49, 633 S.E.2d 196, 201-02 (2006); Fields, 46

- 15 -

III.  CONCLUSION

For the reasons stated above, we affirm the circuit court's judgment terminating father's residual parental rights.

Affirmed.

---

Va. App. at 8, 614 S.E.2d at 659.  Here, because we hold that the evidence was sufficient to support the termination of father's parental rights under Code § 16.1-283(C), we need not review father's argument that the evidence was insufficient to support termination under Code § 16.1-283(B).