COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, Raphael and Lorish

UNPUBLISHED

EUGENE ELLIS

v.       Record No. 0216-22-4

STAFFORD COUNTY DEPARTMENT
 OF SOCIAL SERVICES

MEMORANDUM OPINION[*] BY
JUDGE GLEN A. HUFF
SEPTEMBER 27, 2022

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
Victoria A.B. Willis, Judge

(Kristin Kadar; The Law Office of Kristin Kader, on brief), for
appellant.  Appellant submitting on brief.

(Kristie L. Kane; Brittany S. Carper, Guardian *ad litem* for the minor
children; Kane Perry, P.L.C.; Goodall, Carper & Dillon Law, PLLC,
on brief), for appellee.  Appellee and Guardian *ad litem* submitting
on brief.


Eugene Ellis ("father") appeals the Stafford County Circuit Court's (the "circuit court")

orders terminating his residual parental rights and approving the foster care goal of adoption as

requested by the Stafford County Department of Social Services ("Department").[1]  In his only

assignment of error, father argues the evidence was insufficient to support the involuntary

termination of his rights under Code § 16.1-283(C)(2).  This Court finds no error and affirms the

decision of the circuit court.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Latrice Curtis ("mother") also appealed the circuit court's orders; her appeal is
considered separately.  *See Curtis v. Stafford Cnty. Dep't of Soc. Servs.*, No. 0080-22-4
(Va. Ct. App. Sept. 27, 2022).

## I. BACKGROUND[2]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 168 (2014)).

Initial Foster Care Placement

Father and Latrice Curtis ("mother") are the biological parents to E.C-E., Sy.C-E., Z.C-E., Si.C-E., and R.C-E.[3] The children came to the attention of the Department on September 20, 2019, following a complaint of physical neglect when R.C-E. was admitted to the hospital with a temperature of 103.2 degrees. R.C-E. had received no medical care in the nine months following birth, had received only one vaccination, and had scabbed-over rashes on the chest, arms, and legs. R.C-E. also had an ear infection "for quite some time," coupled with drainage from both ears. R.C-E. was transferred to Children's National Hospital and diagnosed with "eczema herpeticum, atopic dermatitis with the herpes simplex virus."

On September 23, 2019, the Department received a report regarding domestic violence between mother and father. After investigating, the Department learned that the children went hungry at times and were "beat[en] and sometimes punched." Sy.C-E., who was five years old at the time of removal, had not begun school due to lack of the required physical and immunizations. The Department noted scratches and bruises on the children and that they appeared to be "unclean."

---

[2] The record in this case is sealed. Nevertheless, this appeal necessitates unsealing limited portions of the record, including factual findings, to resolve the issues appellant has raised. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

[3] Although father has other children, only his five children with mother are subject to this appeal.

On October 11, 2019, police responded to mother's residence after she reported that father had acted violently towards her, but police could not determine whether an assault had occurred. Mother called 911 later that same day and asked for the Department's assistance. She stated that "she would not keep her kids and 'they could not make her'" and asserted that the children needed to go either to father or to the Department. Although officials advised mother to call 911 only for emergencies and that leaving her children could result in a felony child neglect charge, she continued to call during the following days. The police ultimately arrested mother for misusing 911 and arrested father for violating a protective order. Father was released on bond on October 17, 2019.

On October 18, 2019, the Department received a report of abuse of Sy.C-E. after father showed the director of Sy.C-E.'s daycare bruises on Sy.C-E.'s leg and hip. The Department met with Sy.C-E. on October 22, 2019, and noted an injury that appeared consistent with a strike from a phone cord. Sy.C-E. told the Department that Sy.C-E.'s maternal aunt had caused the injuries. Dr. Robin Foster, a pediatrician and the director of the Child Protection Team at the Children's Hospital in Richmond, testified that Sy.C-E.'s injuries were "not consistent with having happened in normal play or for an accidental causation or being self-inflicted by the child."

School officials also informed the Department that they washed E.C-E. and Sy.C-E.'s clothes because they were "unclean." The Department observed a video of E.C-E. and Sy.C-E. in which they informed school officials that father and their maternal aunt "beat them with a belt and their hands."

On October 23, 2019, Stafford County Child Protective Services identified a lack of appropriate housing for father. The Department ultimately took emergency custody of all five children later that same day. At the time of removal, father did not live with the children, mother was incarcerated, and the children lived with their maternal grandmother and maternal aunt.

<u>Father's Involvement with Department Following Removal</u>

Following the children's removal, the Department developed a Foster Care Service Plan ("Plan") with a goal of returning the children to their parents. The Plan was approved on December 17, 2019, and provided a list of required steps for each parent to take. In particular, the Department required father to provide proof of stable housing, employment, income, and transportation. The Department also required father to participate in family partnership meetings, attend parenting classes, participate in supervised visitation with the children, and complete a psychological evaluation and follow the resulting recommendations, including individual counseling.

Father initially informed the Department that he was self-employed and engaged in a variety of "odd jobs," but he did not provide any proof of that employment or related income. In September 2020, father gave the Department a copy of one pay stub, but the Department could not accept it as proof of employment because "financial information on the document was inked over." Additionally, the address listed on that pay stub belonged to mother only and did not match the residential address where father told the Department he was living. The Department suggested other means by which father could provide the required information, but father claimed that his customers frequently paid him in cash, and he did not feel comfortable asking them to verify his income. Despite the Department's continued efforts and reminders, father failed to provide any other evidence of his employment and income either before or at the circuit court hearing in November 2021. In his testimony before the circuit court, father stated that he primarily keeps the money he earns in a shoebox, which is why he has a low credit score.

The Department also could not verify whether father maintained a stable residence suitable for the children. The address father provided to the Department, and subsequently testified about at the circuit court hearing, was a four-bedroom apartment where father claimed to be living with three of his other children and their mother, none of which are biologically related to Latrice Curtis.

- 4 -

Father failed to provide any bills, postal mail, or other documentation listing that address as his place of residence. Father admitted that he "was not the renter of that residence," and he never confirmed whether the official renter would allow the children subject to this appeal to also live at that residence. Although the Department advised father of his noncompliance with the Plan's housing requirements, father neither completed an application for housing assistance nor independently secured appropriate housing by the time of the circuit court hearing in November 2021. At that hearing, father testified that he "was not ready for the children to come home today" and that he had not secured beds for them at the address where he purported to live.

Meanwhile, father timely attended his supervised visitation with the children "most of the time," though not without issues. During a visitation with R.C-E. in January 2020, father "became upset and frustrated" when R.C-E. started crying. Father expressed anger that the children were becoming close with their foster parents, and he left before the visitation was over. After these visits with father, R.C-E. experienced ongoing problems with sleeping and crying.

In March 2020, father's visitations with Z.C-E. were temporarily suspended after father threatened a Department supervisor during a family partnership meeting. Father's visitations with Z.C-E. resumed in September 2020 after he completed anger management classes. However, Z.C-E.'s therapist, Ryan Hatch, testified before the circuit court that Z.C-E. repeatedly asked to stop having virtual visits or any other contact with both parents, and Mr. Hatch found such visits emotionally harmful to Z.C-E. As a result, and at Mr. Hatch's recommendation, parental visitation of Z.C-E. was discontinued.

Similarly, Si.C-E.'s visitations with mother and father were discontinued in April 2021 to improve Si.C-E.'s mental and physical well-being. Specifically, Si.C-E. experienced increased anxiety and more frequent urination accidents following visitations with mother and father. Those incidents decreased after the visits ceased.

On March 2, 2020, Dr. Andrew Anderson, a clinical psychologist, performed a psychological evaluation on father and conducted a Child Abuse Potential Inventory, which indicated that father was at high risk for committing child physical abuse. Dr. Anderson concluded that father was currently unable to provide safe and effective parenting because he had a "very limited ability to contain his emotions and impulses," was "openly angry and aggressive," met "the criteria for general anxiety disorder," and qualified for "aggressive narcissistic and antisocial traits." According to Dr. Anderson, father needed "an extended course of mental health therapy" for "[a]t least a year, possibly several years." Dr. Anderson recommended that father receive mental health treatment, undergo a psychiatric evaluation to assess medication needs for his anxiety and depression, and participate in parenting classes.

Father completed a parenting class and an anger management class in September 2020. Although father also began counseling during that time, the treatment center ultimately terminated his case after he missed a third session on March 3, 2021. Father did not seek any further counseling by the time of the circuit court hearing in November 2021. In his testimony before the circuit court, father admitted to having thoughts about killing someone in October 2020 and to punching a person in the face in December 2020 for failing to respect him.

Status of Children Following Removal

The Department placed the children in separate homes following their removal. At the time of the circuit court hearing in November 2021, E.C-E. was eight years old and had lived in a total of five different placements. E.C-E. had "tantrums" that included "throwing items, hitting, kicking, [and] spitting." Following placement, E.C-E. initially received "active, intensive, in home" counseling for multiple hours every week and continued to participate in bi-weekly outpatient counseling.

After coming into foster care, Sy.C-E. was hospitalized three times for "[s]uicidal ideation, aggression, anger, and erratic behavior." While in foster care, Sy.C-E. met regularly with an individual counselor and participated in group therapy, animal therapy, art therapy, and music therapy. Sy.C-E., who was seven years old at the time of the circuit court hearing, remained in the same foster home until early 2020, at which time the Department transferred Sy.C-E. to a residential treatment facility due to ongoing suicidal ideations.

Z.C-E., who was six years old at the time of the circuit court hearing, lived in a therapeutic foster care home and received out-patient counseling for post-traumatic stress disorder. A forensic medical exam conducted after removal revealed that Z.C-E. had several healing wounds and injuries that were "consistent with non-accidental inflicted trauma." When initially entering foster care, Z.C-E. acted frightened and nervous around others. Over time, Z.C-E. bonded strongly with their foster family, regularly attended school, and showed much progress. Z.C-E.'s counselor warned that there would be "risks" to Z.C-E.'s emotional and mental well-being should Z.C-E. return to their biological family.

Si.C-E., who was five years old at the time of the circuit court hearing, had lived in the same foster home since removal. Si.C-E. regularly participated in counseling for post-traumatic stress disorder exhibited by Si.C-E. pulling out their own hair, picking their own cuticles, withholding bowel movements, and experiencing sleeplessness and bed-wetting. Si.C-E. attended daycare full time, and teachers complimented Si.C-E.'s behavior.

R.C-E., who was three years old at the time of the circuit court hearing, had lived in the same foster home since removal and thrived there. The Department described R.C-E. as "joyful" and "developmentally on track."

Since entering foster care, the four older children received restorative dental care to repair "multiple cavities." The children also received necessary pediatric care. E.C-E. saw a urologist

due to issues with bed-wetting. Si.C-E. suffered from a sleep disorder, allergies, and skin irritation. Si.C-E. also received treatment from a gastroenterologist and a urologist for problems with bowel movements and urination accidents, respectively. R.C-E. received treatment from a pulmonologist, an orthopedist, and an ear, nose, and throat doctor. R.C-E. underwent two different procedures: a "scope of multiple areas," and a corrective procedure to repair a "cleft in [the child's] throat" that created difficulty swallowing. Father withheld consent for a period of time before eventually allowing the doctors to perform those procedures on R.C-E.

## Termination of Father's Residual Parental Rights

In September 2020, the Department requested that the Stafford County Juvenile and Domestic Relations District Court ("JDR court") terminate father's parental rights and approve the new foster care goal of adoption.[4] The JDR court denied the request on November 2, 2020, and gave both parents more time to complete the Department's requirements. In December 2020, the Department again requested a change of goal to adoption. Following a hearing in April 2021, the JDR court approved the change to adoption for all five children and terminated father's residual parental rights. Father appealed the JDR court's order to the circuit court.[5]

The circuit court held a *de novo* trial on November 17 and 18, 2021, at which both mother and father testified. The circuit court subsequently issued a letter opinion on December 14, 2021. The court approved the foster care goal of adoption and found that the Department had met its burden, pursuant to Code § 16.1-283(C)(2), to terminate father's parental rights.

In its opinion, the circuit court presented a thorough eleven-page recitation of the evidence and arguments presented at trial. The circuit court then used those facts to consider the

---

[4] The Department also sought the termination of mother's parental rights.

[5] The JDR court also terminated mother's parental rights, and she appealed the JDR court's rulings to the circuit court.

question of termination for each parent separately with regard to each of the five children individually. The circuit court ultimately concluded that termination of father's parental rights was appropriate because he did not provide "proof of employment, a stable residence, [or] continued mental health counseling," as required by the Department's Plan. The circuit court also determined that father was never "an active involved parent" and "took no responsibility for the medical care or schooling of the children." Although father generally interacted well with the children during visitations, the court found he had not developed a definitive plan for the children regarding their schooling, stable housing, and medical care. In support of that finding, the circuit court listed each child's specific educational, emotional, and medical needs, followed by the conclusion that father demonstrated an inability to sufficiently meet, or even acknowledge, those needs.

In particular, the circuit court explained that Sy.C-E.'s "suicidal and aggressive" behavior, Z.C-E.'s stunted intellectual development, E.C-E. and Si.C-E.'s behavioral issues, and R.C-E.'s medical issues all require a high level of care, which father does not understand and cannot provide. The circuit court also opined that father's refusal to take any responsibility for the children's problems—all of which have resulted from trauma caused by both parents— prevents him from adequately addressing the children's complex psychological needs. Indeed, both Z.C-E. and Si.C-E. explicitly expressed a desire to sever ties with father because he physically abused them.

On December 21, 2021, the circuit court entered orders terminating father's and mother's residual parental rights as to all five children and approved the foster care goal of adoption. This appeal followed.[6]

---

[6] Mother also timely appealed the circuit court's ruling to this Court. *See Curtis v. Stafford Cnty. Dep't of Soc. Servs.*, No. 0080-22-4.

## II. STANDARD OF REVIEW

On appeal from a trial court order terminating residual parental rights, this Court reviews the evidence "in the light most favorable to the prevailing party below and its evidence is afforded all reasonable inferences fairly deducible therefrom." *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991); *see also Yafi*, 69 Va. App. at 550-51. Because the circuit court retains "broad discretion in making the decisions necessary to guard and to foster a child's best interests," it is presumed, on review, to have "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (quoting *Logan*, 13 Va. App. at 128); *see also Eaton v. Washington Cnty. Dep't of Soc. Servs.*, 66 Va. App. 317, 324 (2016). Accordingly, the circuit court's judgment "is entitled to great weight and 'will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" *Thach*, 63 Va. App. at 169 (quoting *Logan*, 13 Va. App. at 128); *see also Bristol Dep't of Soc. Servs. v. Welch*, 64 Va. App. 34, 44 (2014) (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986)). Therefore, this Court will not reverse the circuit court's judgment terminating father's parental rights unless the evidence, viewed in the light most favorable to the Department, was insufficient to support it.

## III. ANALYSIS

Father's sole assignment of error argues that the circuit court erred in terminating his residual parental rights under Code § 16.1-283(C)(2). He contends that the evidence presented to the circuit court was insufficient to prove (1) that termination was in the children's best interests and (2) that he was unwilling or unable to remedy the conditions necessitating the children's foster care placement.

Under Code § 16.1-283(C)(2), a court may terminate residual parental rights if it finds, by clear and convincing evidence, that doing so is in the best interests of the child *and* that the parent

has not substantially remedied the conditions leading to foster care placement. While the court must consider those two inquiries separately from one another, it may naturally find that a specific piece of evidence is relevant to both questions. Here, the record provides ample evidence to support the circuit court's order terminating father's parental rights under both prongs of Code § 16.1-283(C)(2).

### A. Best Interests of the Children

This Court has repeatedly held that application of the "best interests" standard requires a fact-specific inquiry in each individual case. *See Welch*, 64 Va. App. at 48-49. In determining what is in the best interests of a child in a particular case, the trial court must consider and evaluate a variety of factors, including:

> the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

*Id.* at 48 (quoting *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 161 (2004)). Where the circuit court has "relied on appropriate factors and pointed to some evidence supporting its decision, this Court cannot hold that the circuit court's best interests determination was 'plainly wrong' or 'without evidence to support it.'" *Id.* at 49 (quoting *Martin*, 3 Va. App. at 20).

The circuit court here considered appropriate factors and evidence in determining that termination of father's parental rights was in the best interests of each of his five children. Indeed, the circuit court conducted an exceedingly thorough, thoughtful, and comprehensive review of the trial evidence and supporting exhibits as they related to the best interests of each child individually, as well as with respect to each parent separately. Specifically, the court made particularized findings as to the educational, psychological, and medical needs of each child. Similarly, the court

also considered father's financial and mental capabilities, as well as his past, present, and expected future relationship with each child.

Father argues that he "demonstrated a strong commitment to maintaining a relationship with his children" by attending all but one scheduled visitation. However, parental responsibilities demand more than one's mere presence. Moreover, some of the children had severe negative reactions as a result of visitations with father. In particular, Si.C-E. told father during one visitation that Si.C-E. did not want to see him anymore, and Z.C-E.'s extreme fear of father resulted in the discontinuation of visitation after Z.C-E.'s treating professionals suggested that such visits caused more harm than good to Z.C-E.

Additionally, the record supports the circuit court's conclusion that, before removal, father had not been "an active involved parent" in his children's lives. For example, the children's extensive and varied mental health, dental, and medical needs upon entering care demonstrate that father had taken no responsibility for the children's physical and psychological care. Father's attempt to pass the blame to mother does not absolve his own failure to attend to his children's needs. As the circuit court found, the record contains no evidence that father understood or appreciated his role in the failure to provide needed care for his children.

Although father argues that nothing established that he would be unable to meet the children's needs in the future, the circuit court found otherwise based on father's persistent failures to provide required proof of employment and stable residence, to complete required mental health counseling, and to plan for the children's medical care and schooling. Father even acknowledged at trial that he "was not ready for the children to come home today" and he did not even have beds for them at the house where he was currently staying.[7] In contrast, despite their placement in separate foster homes, each child benefitted from the individualized counseling, medical care, and dental

---

[7] Father also testified that he was neither the official owner nor renter of that property.

care provided by their foster families. Father has not demonstrated that he can likewise meet the unique physical and psychological needs of his children.

Finally, the record lacks evidence that additional time would improve father's situation, and father himself could not say when he would definitively be ready to take custody of the children. Indeed, at the time of the circuit court trial in November 2021, the children had already languished in foster care for more than two years. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 322 (2013) (alteration in original) (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)).

In weighing all of the above factors, among others, the circuit court conducted an appropriate "best interests" analysis. Accordingly, the circuit court did not err as matter of law in finding that termination of father's parental rights was in the best interests of the children.

## B. Failure To Remedy

Under Code § 16.1-283(C)(2), the trial court must also determine whether the parent or parents, without good cause, were either unwilling or unable to substantially remedy the conditions that led to or required continuation of the child's foster care placement. "[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi*, 69 Va. App. at 552 (alteration in original) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)). The trial court must therefore determine "whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services." *Thach*, 63 Va. App. at 170 (quoting *Toms*, 46 Va. App. at 271).

Father contends that the circuit court erred because he complied with many of the Department's requirements. While those efforts are certainly relevant, the circuit court found he still failed, without good cause, to substantially remedy the conditions precipitating his children's removal within the statutorily prescribed twelve-month time period. Specifically, father offered no proof of employment, income, or stable residence, and he failed to adequately engage in mental health counseling as required by the Department's Plan. Those factors all bear on father's ability to both appreciate and appropriately address each child's unique physical and psychological needs. Father's inability or unwillingness to comply with those requirements demonstrates a failure to substantially remedy the neglect and abuse his children suffered in mother and father's care prior to removal. In particular, although father eventually completed a psychological evaluation, he never pursued ongoing therapy for his emotional disorders, as recommended by Dr. Anderson.

Accordingly, the record contains sufficient evidence that father failed to meet the statutory requirements under Code § 16.1-283(C)(2). Therefore, the failure to remedy, in conjunction with the circuit court's "best interests" determination, establishes that the circuit court did not err in terminating father's parental rights pursuant to Code § 16.1-283(C)(2).[8]

## IV. CONCLUSION

For the foregoing reasons, this Court affirms the judgment below terminating father's parental rights and approving the foster care goal of adoption.

*Affirmed.*

---

[8] With respect to father's challenge of the foster care goal of adoption, this Court's "decision to affirm the termination order necessarily subsumes this aspect of his appeal because a preponderance-of-the-evidence standard governs judicial modifications of foster care plans." *Toms*, 46 Va. App. at 265 n.3.