COURT OF APPEALS OF VIRGINIA

Present:    Judges Beales, Huff and Chaney
Argued by videoconference


HOLLAND WINDELL BUTLER, III

                                                                    MEMORANDUM OPINION* BY
v.        Record No. 1152-22-1                                   JUDGE GLEN A. HUFF
                                                                         JULY 5, 2023
JAMES CITY COUNTY DEPARTMENT
 OF SOCIAL SERVICES


            FROM THE CIRCUIT COURT OF THE CITY OF WILLIAMSBURG AND
                           COUNTY OF JAMES CITY
                              Holly B. Smith, Judge


            Charles E. Haden for appellant.

            Liz Parman; Paul E. Freeman, Guardian ad litem for the minor
            children (James City County Attorney's Office, on brief), for
            appellee.


        Holland Windell Butler, III ("father") appeals the circuit court's orders terminating his

parental rights to his children and approving the foster care goal of adoption.  His primary

contention is that the James City County Department of Social Services (the "Department") failed to

prove the criteria for termination—required by Code § 16.1-283(C)(2)—by clear and convincing

evidence.  As part of that argument, father specifically alleges that: (1) the circuit court erred by

finding him unable or unwilling to remedy the conditions that led to the children's placement or

continuation in foster care, (2) the Department failed to make reasonable and appropriate efforts to

assist him in remedying the conditions that led to the children's placement in foster care, and

(3) termination of his parental rights was not in the children's best interests.  For the following

reasons, this Court affirms the decision of the circuit court.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 168 (2014)).

Father and Miranda Dalton ("mother") are the biological parents to T.B., C.B., R.B., and J.B., who were 14, 12, 7, and 5 years old, respectively, at the time of their removal.[2] The children entered foster care on April 20, 2021, pursuant to an entrustment agreement mother signed after "a highly concerning car accident" that resulted in her and J.B. being transported to the hospital.[3] Father had been incarcerated since 2016 for possession and distribution of drugs; he was released in March 2023, according to his counsel's statement at oral argument before this Court.

Father identified two family members, his cousin and his niece, as possible relative placements. However, his niece opted out of serving as a placement, and his cousin concluded she did not have the ability to care for the children, and so the Department determined that they were not suitable placements. Mother recommended fictive kin—a family from her church who treated her and her children as family—to serve as a foster placement. The Department placed all four children with that family after mother signed the entrustment agreement.

---

[1] The record in this case is sealed. Nevertheless, this appeal necessitates unsealing limited portions of the record, including factual findings, to resolve the issues father has raised. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

[2] Father is also the biological father to six adult children, who are not the subject of this appeal.

[3] Father did not sign the entrustment but "was very much in agreement" with the arrangement.

The Department's goals for father, upon his release from incarceration, were to provide the children with a safe and stable home dwelling, provide for the children financially, provide for the children's physical, emotional, and mental health needs, and make sure they were on the appropriate educational track. The Department expected father, while he was incarcerated, to engage in parenting education programs and other therapy services. Because COVID-19 protocols prevented father from engaging in some services while incarcerated, the Department arranged for him to receive parent coaching with Family Priority, which offered him written materials and telephonic therapy sessions. Father, however, "refused" parent coaching. The Department also offered father substance abuse treatment services—based on the nature of his criminal convictions—which were available to him during his incarceration. Father refused those services as well.

Regarding father's contact with the children while incarcerated, the Department arranged regular telephone calls with the children. In December 2021, those conversations became "increasingly concerning" because father was "badgering" the children and would become angry if they did not "recall an interaction from the past." Father told the children that "they c[ould] only love people he deem[ed] appropriate," and he became upset when the children "identified the foster family as their family." He even made some "negative remarks" directly to the foster mother that caused her to feel threatened. As a result of father's behavior, the children also became upset during the phone calls, and the conversations between them and father became increasingly "heated." Consequently, the Department suspended the calls entirely and arranged for father to send letters to the children instead. He did not take advantage of that opportunity.

At the request of the oldest child, the Department arranged for father to participate in family therapy sessions. But father was hesitant to participate and "didn't feel the need for that." Although he did engage in two family therapy sessions, it "never got beyond the rapport building

- 3 -

stage." Following father's threatening conversation with the foster mother, the oldest child asked to cease the therapy sessions with father.

Due to his incarceration, father had not seen the three oldest children in person since 2017, and he had never met J.B., the youngest. Father assured the Department that he had "several thousand dollars stashed away" that he could use to procure a home upon release from imprisonment and that he would have "no problems getting a job" due to his ties in his community. Specifically, he planned for his cousin to support him and the children while he attempted to find a suitable home and obtain employment.

Mother had expressed concerns to the Department about father's parenting of the children before he was incarcerated. They had lived in three different hotels from October 2015 until April 2016. Mother explained that father would go missing for several days and that, before father's incarceration, mother "started using hard drugs when [father] was dealing them to her."

At the time of removal, the children faced a number of challenges and demonstrated "concerning behaviors." All four children had been diagnosed with post-traumatic stress disorder. T.B., age 14, was also diagnosed with depressive disorder and had not received any mental health treatment despite having expressed violent thoughts and attempted suicide. C.B., age 12, was diagnosed with generalized anxiety disorder. R.B., age 7, demonstrated significant delays in educational and social development, including difficulty engaging in "appropriate social and peer interactions." J.B., age 5, had expressed suicidal ideations, struggled with attachment, and had difficulty controlling emotions. While in foster care, all four children have received mental health services, equine therapy, and medical and dental health care. During that time, they improved academically and participated in extra-curricular activities.

Based on father's failure to complete required services while incarcerated, the Department petitioned for the termination of his parental rights. On March 3, 2022, the juvenile

and domestic relations district court (the "JDR court") terminated father's parental rights and approved the foster care goal of adoption. Father appealed the JDR court's rulings to the circuit court.

The circuit court conducted a hearing on June 27, 2022. After considering the testimony, evidence, and parties' arguments, the circuit court terminated father's residual parental rights for all four children and approved the foster care goal of adoption. T.B. did not object to the termination of father's parental rights.

In making its ruling, the circuit court acknowledged that father had some communication with the children, but noted that he had made threatening statements, which caused the Department to suspend the telephone visitations. And although father's counselors recommended he write letters to the children, in lieu of the telephone calls, father failed to do so. The circuit court found that the Department had "gone beyond" to provide services to father, but that he failed to complete the required services.

Furthermore, the circuit court noted that the children's PTSD diagnoses made them "particularly vulnerable to any instability," and father did not have a stable housing plan upon his future release from incarceration. It determined that father could not "substantially correct or eliminate his situation so as to allow his children's safe return to a home he d[id] not have within a reasonable period of time." Thus, after emphasizing the children's "tremendous progress" and happiness since coming into foster case, the circuit court concluded that "it is not healthy for children to be in foster care without any end date in sight."

On June 27, 2022, the circuit court entered orders for involuntary termination of father's residual parental rights for all four children and approved the foster care goal of adoption. Father timely appealed.[4]

ANALYSIS

Father asserts that the circuit court erred in terminating his parental rights under Code § 16.1-283(C)(2). "On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (alteration in original) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011) (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986)).

Father makes several arguments in support of his challenge to the circuit court's ruling. First, he contends that termination of his parental rights was not in the best interests of the children. Second, he claims that, after his release from incarceration, he expects to quickly remedy the conditions that led to the children's placement in foster care. He argues there should be no "rush" to terminate his parental rights before his release from incarceration. Third, father alleges that the Department failed to offer him appropriate services, as they were "curtailed" due to the COVID-19 restrictions. Finally, father insists that less drastic options, such as relative placement, were available instead of terminating his parental rights.

---

[4] After mother failed to appear at the circuit court hearing, the circuit court deemed that mother's appeal was withdrawn under Code § 16.1-106.1(D).

Father's parental rights were terminated under subsection (C)(2) of Code § 16.1-283, which permits the circuit court to terminate a parent's rights if it finds, by clear and convincing evidence, that doing so is "in the best interests of the child" *and*

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi*, 69 Va. App. at 552 (alteration in original) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)). "'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 163 (2004) (quoting *Ferguson v. Stafford Cnty. Dep't of Soc. Servs.*, 14 Va. App. 333, 338-39 (1992)).

The record provides ample evidence to support the circuit court's order terminating father's parental rights under Code § 16.1-283(C)(2). At the outset, this Court acknowledges that although "long-term incarceration does not, per se, authorize termination of parental rights," it does constitute "a valid and proper circumstance which, when combined with other evidence concerning the parent/child relationship, can support a court's finding by clear and convincing evidence that the best interests of the child will be served by termination." *Ferguson*, 14 Va. App. at 340.

And contrary to father's arguments, the Department was not required to offer him services while he was incarcerated. *See Harrison*, 42 Va. App. at 163-64. Nevertheless, and despite COVID-19 restrictions, the Department arranged for father to have regular telephone contact with

the children, offered to assist him in sending letters to the children, and secured opportunities for him to participate in therapy sessions with the children, as well as receive parent coaching and recovery services.

Yet the record shows that father failed to fully engage in those services while incarcerated. Although father initially participated regularly in telephone calls with the children, the Department suspended those sessions due to father's aggressive and threatening behavior and the resulting negative effects on the children. Father then refused to maintain contact with the children by writing them letters, despite the Department's offer of assistance to do so. Even before his incarceration, father failed to provide stability for the children: the family lived in three separate hotels over the course of six months, father would disappear for days at a time, and father supplied drugs to mother. The three oldest children had not seen father since his incarceration in 2017, and J.B., the youngest child, had never met father.

Furthermore, the children entered foster care with "significant" psychological needs: all four children were diagnosed with PTSD, the eldest had attempted suicide and the youngest expressed suicidal ideations, the second oldest struggled with anxiety, and the second youngest had developmental difficulties, both academic and social. However, at the time of the circuit court hearing, the children had made "tremendous progress" and were "thriving" with their foster family, with whom they had been living for 14 months. In contrast, father had not made progress in completing the services offered to him by the Department, his phone calls with the children were discontinued as a result of his aggressive and threatening behavior, and he subsequently made no attempt to repair his deteriorating relationship with the children by writing them letters or participating in family therapy and parental counseling. Consequently, father was in no position to assume custody, even upon his release from incarceration.

Moreover, there is no evidence that additional time would have improved father's situation or his willingness to meet his parental obligations. Other than general statements made in anticipation of his release from custody, father has offered no proof of nor definite plans for either employment or a stable and suitable residence for himself and the children. And although father testified that he and the children could live with his cousin, the Department determined, after investigating the suggested placement, that the cousin's home was not a suitable placement for the children. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 322 (2013) (alteration in original) (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)). Based on the record here, the circuit court did not err in terminating father's parental rights under Code § 16.1-283(C)(2).

## CONCLUSION

For the foregoing reasons, this Court finds no error in the circuit court's ruling below. Accordingly, this Court affirms the orders terminating father's parental rights and approving the foster care goal of adoption.

*Affirmed.*