COURT OF APPEALS OF VIRGINIA

Present: Judges Causey, Raphael and Senior Judge Clements

EN'DAYIA DANIELLE BOLER

v.     Record No. 1430-22-4

FAIRFAX COUNTY DEPARTMENT
 OF FAMILY SERVICES

MEMORANDUM OPINION*
PER CURIAM
SEPTEMBER 12, 2023

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Brett A. Kassabian, Judge

(Brandon R. Sloane; Dennis, Stewart & Krischer, PLLC, on brief),
for appellant. Appellant submitting on brief.

(Donna R. Banks, Assistant County Attorney; Kathleen Rust Bell,
Guardian ad litem for the minor child, on brief), for appellee.


En'Dayia D. Boler (mother) appeals the circuit court's order terminating her parental rights

to her child, Z.B. Mother argues that the circuit court erred by denying her motion for a

continuance and by admitting certain evidence at trial. She also challenges the sufficiency of the

evidence to terminate her parental rights under Code § 16.1-283(B) and (C). After examining the

briefs and record in this case, the panel unanimously holds that oral argument is unnecessary

because "the appeal is wholly without merit." Code § 17.1-403(ii)(a); Rule 5A:27(a).

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 168 (2014)).

Mother is a biological parent to Z.B. Z.B.'s putative father has an extensive criminal history and lives in El Salvador. Although mother and Z.B. lived in an apartment with Z.B.'s grandmother and uncle, mother's name had been removed from the lease because numerous domestic disturbances had resulted in more than 200 police responses to the apartment. The apartment complex had threatened to evict grandmother if the police "responded to her home one more time." Nevertheless, grandmother allowed mother to live in the apartment because she was concerned for Z.B.'s safety.

On August 31, 2018, Officer Michael Tokarski went to grandmother's apartment in response to a report of a domestic disturbance. Office Tokarski determined that the dispute arose because mother was upset that grandmother would not babysit Z.B. Officer Tokarski reported that the apartment was "very dirty and unsuitable for" the one-year-old Z.B. There was no crib, so Z.B. slept on a mattress on the living room floor with mother. Electric cords connected to a large television resting on a "makeshift" television stand extended under the mattress. Various objects completely covered and obscured the rest of the living room floor. Officer Tokarski learned that mother often left Z.B. with the building's maintenance man and would not return

---

[1] The record in this case was sealed. "To the extent that this opinion discusses facts found in the sealed record, we unseal only those specific facts." *Hawkins v. Town of South Hill*, ___ Va. ___, ___ n.1 (Oct. 20, 2022). "The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

until his family complained. Z.B. had not attended day care for several months because mother failed to complete the necessary paperwork for "daycare assistance through the county."

On September 16, 2018, Officer Jacob Gibson went to the apartment in response to another report of a domestic dispute involving mother. Officer Gibson determined that the dispute arose when Z.B.'s uncle declined to babysit Z.B. The dispute ended when a neighbor drove mother and Z.B. to a nearby shelter. The next day, mother asked a local high school for assistance buying diapers, so the school gave her a $25 gift card. Mother used the gift card to buy headphones and diaper wipes.

Meanwhile, grandmother asked the Fairfax County Department of Family Services (the Department) for help because mother "needed to leave her home." The Department helped mother find temporary housing at a community shelter. Although full, the shelter agreed that mother could sleep on a couch while Z.B. slept in a play pen until a bed became available. Mother did not report to the shelter; instead, she called "people" and asked if she could stay with them. Later that evening, a police officer reported that mother "wanted to kill herself by walking into traffic," so he drove her to a mental health center for a psychiatric evaluation. Mother was released "with a plan to follow up with a mental health case manager" after "it was determined that she was no longer a danger to herself."

Mother returned to grandmother's apartment, packed clothes, and left Z.B. in grandmother's care. After mother left, grandmother told the Department that mother was not taking medication prescribed to treat her manic bipolar disorder and had lied to the psychiatrist by stating the shelter did not have room for Z.B. Rather than accepting the Department's assistance in securing housing at a shelter, mother sought counseling from the high school's social worker, who escorted mother to the mental health center for further evaluation. Mother was "accepted into a crisis care residential program to stabilize her mental health."

Although grandmother claimed she could care for Z.B., the Department was concerned because previous investigations revealed that grandmother had abused controlled substances, demonstrated "drug seeking behavior," and had frequent hospitalizations. Moreover, the Department repeatedly had observed rotting food, blocked walking paths, overflowing trash, and accessible pill bottles in grandmother's apartment. The Department also was concerned that grandmother could not keep mother away from the apartment. Accordingly, on September 19, 2018, the Department removed Z.B. from grandmother's care and, when no suitable relative was located, placed him in a foster home.

On September 25, 2018, the Fairfax County Juvenile and Domestic Relations District Court (the JDR court) found that Z.B. was abused or neglected and placed him in the Department's custody. The JDR court ordered mother to participate in psychological treatment, complete a "parent-child assessment" and follow any treatment recommendations, and maintain stable housing. In addition, the Department instructed mother that to be reunited with Z.B. she had to maintain her medication regimen and demonstrate "mental health stability," maintain her relationship with Z.B. by attending bi-weekly visits, participate in a parenting education program, participate in an "Infant and Toddler Connection" assessment, complete high school, obtain employment, and provide a hazard-free home.

In November 2018, mother participated in a psychological evaluation and parent-child assessment with Dr. William Ling. Dr. Ling concluded that mother's "emotional vulnerability and cognitive disorganization" needed to be addressed "through individual treatment and psychotropic medication." Nevertheless, as of February 2019, her "undeveloped emotional psyche, immaturity, and lack of insight" continued to be a "great[] obstacle" to reunification with Z.B. Mother failed to maintain her medication regimen, which impacted her "decision making abilities," and was not participating in mental health counseling. She was pregnant with her

second child, and her relationship with grandmother remained unstable and chaotic. She also failed to secure "appropriate housing" or maintain "consistent employment" and steadfastly resisted the Department's suggestions that she reside at the community shelter.

By July 2019, mother stopped attending school and began cancelling some of her weekly supervised visitation sessions with Z.B. In addition, although mother had been living with her aunt's family after her second child, C.B., was born, she had to "vacate" the home after two months because of an argument with her aunt. Meanwhile, Z.B. thrived in foster care. He learned to identify colors, follow instructions, and be aware of his environment. He also attended a day care where he socialized with other children and developed motor skills.

Between July and October 2019, mother completed parenting education classes. Nevertheless, she cancelled many of her visits with Z.B. in December 2019. During the visits she did not cancel, she was often "on her phone," and her mood limited her ability to "interact and engage with" Z.B. She refused to take her medication and, after a reassessment for mental health services on December 16, 2019, was placed on a waitlist for outpatient therapeutic services. In addition, her housing remained unstable and she lived in at least four different households over a six-month period.

In December 2019, mother secured a two-bedroom apartment, despite her continued unemployment, with the help of a housing voucher program. In addition, mother completed another mental health assessment and began weekly treatment sessions with Winifred Allen, a certified therapist, on January 13, 2020. The Department intended to allow Z.B. to visit mother at her apartment after confirming it was ready. During a home visit to the apartment in February 2020, however, boxes and other items cluttered the apartment, making it difficult to "walk through." Mother admitted that she was struggling to establish the apartment while caring for C.B. Mother cancelled numerous visits with Z.B. in January and February 2020.

In March 2020, mother enrolled in high school and arranged for childcare for C.B. When Fairfax County Public Schools closed the following week because of the COVID-19 pandemic, she participated in remote learning but often missed classes and was at risk of failing three courses. In response to the pandemic, the Department suspended face-to-face visitation and transitioned to videoconference visits. The Department agreed to a face-to-face visit around Z.B.'s birthday, but mother failed to communicate with the Department about the visit in a timely manner.

In April 2020, mother became pregnant with her third child. In addition, she continued to miss scheduled visits with Z.B. through October 2020. The Department reported that her visits with Z.B. remained supervised because of her "observable fatigue, inactivity, and need for prompting to engage and interact with" Z.B. Although mother claimed that her third pregnancy was high-risk, her doctor contradicted that claim.

The Department petitioned the JDR court to terminate mother's parental rights and change Z.B.'s permanency goal to adoption "to prevent further risk of physical and emotional neglect." The Department acknowledged mother's participation in mental health services and counseling but argued that Z.B. had been in foster care for more than two years, during which mother failed to make significant progress toward reunification. The JDR court continued the hearing several times for various reasons, including the mother and grandmother's repeated hospitalizations. After a hearing on October 8, 2020, the JDR court terminated mother's parental rights and changed Z.B.'s permanency goal to adoption.

Mother appealed the JDR court's order to the circuit court. Trial originally was scheduled for February 22, 2022, but mother moved to continue the case three times due to her and grandmother's illnesses. The circuit court granted the motions but ordered on July 18, 2022 that any further continuance requests for medical reasons had to be accompanied by

documentation.  After a two-day trial on August 22 and 23, 2022,[2] the circuit court terminated

mother's parental rights to Z.B. under Code § 16.1-283(B) and (C) and entered a permanency

planning order approving the goal of adoption.

On appeal, mother argues that the circuit court abused its discretion by denying her

motion for a continuance on the first day of trial because she was in the hospital.  She also argues

the circuit court erred by admitting orders and documents from the JDR court proceedings.

Finally, she contends that the evidence was insufficient to terminate her parental rights under

Code § 16.1-283(B) and (C).

ANALYSIS

I.  Continuance and Evidentiary Rulings

"On appeal, we presume the judgment of the trial court is correct."  *Bay v. Commonwealth*,

60 Va. App. 520, 528 (2012).  "The burden is upon the appellant to provide [the appellate court]

with a record which substantiates the claim of error."  *Dixon v. Dixon*, 71 Va. App. 709, 716 (2020)

(alteration in original) (quoting *Robinson v. Robinson*, 50 Va. App. 189, 197 (2007)).  Without a

sufficient record, we will not consider the asserted error.  *Id.*  A transcript of any proceeding or a

written statement of facts in lieu of a transcript becomes part of the record if filed in the circuit

court clerk's office within sixty days after entry of final judgment.  Rule 5A:8(a) and (c).  "When

the appellant fails to ensure that the record contains transcripts or a written statement of facts

necessary to permit resolution of appellate issues, any assignments of error affected by such

omission shall not be considered."  Rule 5A:8(b)(4)(ii).  *See also Smith v. Commonwealth*, 32

Va. App. 766, 771 (2000) (holding that "[t]his Court has no authority to make exceptions to the

filing requirements" for transcripts "set out in the Rules" (quoting *Turner v. Commonwealth*, 2

Va. App. 96, 99 (1986))).

---

[2] The record does not include a transcript or written statement of facts from the trial.

Mother relies on proffers and assertions allegedly made to the circuit court on the first day of trial to argue that the court abused its discretion by denying her motion for a continuance and by admitting documents and orders from the JDR court proceedings. Specifically, she alleges that she proffered to the circuit court that she was again hospitalized and could not appear for trial. She also alleges several independent grounds that, in her view, should have resulted in the exclusion of the challenged evidence. The record, however, contains neither the proffers or arguments made at trial nor the circuit court's findings or rulings.

With no record of the evidence and arguments mother made or the positions she took (or possibly abandoned) at trial, we cannot know if her appellate argument repudiates a position that she may have taken in the circuit court, let alone whether the circuit court ruled, and erred, as she claims. *See Nelson v. Commonwealth*, 71 Va. App. 397, 403 (2020) (recognizing that a party may not take inconsistent positions during the course of litigation). Thus, the transcript, or a written statement of facts in lieu of a transcript, from the trial is indispensable to address mother's arguments under her first and second assignments of error. Accordingly, her arguments are waived. Rule 5A:8(b)(4)(ii).

## II. Termination of Parental Rights

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011) (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986)).

Mother argues that the circuit court erred in terminating her parental rights to Z.B. under Code § 16.1-283(B) and (C). She argues that the circuit court erroneously based its judgment on "selective portions of the evidence," including the testimony of two expert witnesses, and ignored her "efforts" and testimony. She emphasizes the progress she made in reunification, her efforts to further her education, and her success in securing stable housing. Mother admits that there were "lapses" in her visits with Z.B. but argues she made "regular effort[s]" to maintain contact. She also argues that of the eight witnesses who testified at trial, none claimed she had stopped "trying to be a mother" or "connect" with Z.B.

The circuit court found that clear and convincing evidence supported the termination under Code § 16.1-283(C)(2), which authorizes a court to terminate parental rights if it is in the best interests of the child and:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi*, 69 Va. App. at 552 (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)).

Although mother had participated in some of the recommended services, such as the psychological evaluation, intermittent counseling, and parent coaching, she had failed to remedy substantially the conditions that required Z.B.'s initial placement and continuation in foster care. While Z.B. was in foster care, mother's mental health issues remained the primary obstacle for reunification. The record establishes that she failed to take her prescribed medication

consistently or regularly participate in mental health counseling. She also failed to maintain consistent employment. Even after securing an apartment, mother was unable to furnish and organize it so that the Department would permit Z.B. to visit her there. Mother also repeatedly cancelled both in-person and videoconference visits with Z.B. During the visits she did attend, she was often "on her phone" and her interaction with Z.B. was limited.

Meanwhile, Z.B. thrived in foster care. At the time of the circuit court hearing, he had been in foster care for more than two years, and mother still was unable to resume custody. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 322 (2013) (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)). Considering the totality of the circumstances, the circuit court did not err in terminating mother's parental rights to Z.B. under Code § 16.1-283(C)(2).

"When a lower court's judgment is made on alternative grounds, this Court need only determine whether any of the alternatives is sufficient to sustain the judgment." *Castillo*, 68 Va. App. at 574 n.9; *see also Fields v. Dinwiddie Cnty. Dep't of Soc. Servs.*, 46 Va. App. 1, 8 (2005) (affirming the termination of parental rights under one subsection of Code § 16.1-283 and not addressing the termination of parental rights under another subsection). We find that the circuit court did not err in terminating mother's parental rights under Code § 16.1-283(C)(2); therefore, we do not need to reach the question of whether mother's parental rights also should have been terminated under Code § 16.1-283(B) or (C)(1).

CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

*Affirmed.*